IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ANGELA MIDTHUN-HENSEN and TONY HENSEN,
  as representatives of their minor Daughter, K.H., and
  on behalf of all others similarly situated,

                                    Plaintiffs,

    v.

GROUP HEALTH COOPERATIVE OF SOUTH
CENTRAL WISCONSIN, INC.,

                      Defendant.

OPINION AND
ORDER

21-cv-608-slc

---

In this putative class action for monetary and equitable relief, plaintiffs Angela Midthun-Hensen and Tony Hensen, as representatives of their minor daughter, K.H., allege that from 2017-2019, their health insurance provider, Group Health Cooperative of South Central Wisconsin, Inc. ("GHC"), unreasonably and unlawfully denied coverage for speech and occupational therapy as treatment for K.H.'s Autism Spectrum Disorder ("ASD"). Plaintiffs assert three causes of action: (1) to recover benefits due under GHC's health plan, pursuant to 29 U.S.C. § 1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"), as enforced through 29 U.S.C. § 1132(a)(1)(B); (2) GHC violated the Mental Health Parity and Addiction Equity Act of 2008 ("Parity Act")[1] by failing to provide the sought-after treatment; and (3) GHC violated Wis. Stat. § 632.895, which mandates health insurers to provide certain coverage to treat ASD.

In the parties' Rule 26(f) report, GHC asserted that no discovery was necessary until the court resolved some threshold questions, namely, (1) whether GHC had reasonably determined that its plan did not provide the therapy requested by plaintiffs because the treatments were not

---

[1] an ERISA amendment codified at 29 U.S.C. § 1185a(a).

evidence-based and were instead experimental and investigational, and (2) whether broader coverage was mandated by either the Federal Parity Act or Wisconsin's healthcare mandate. Dkt. 11. At the preliminary pretrial conference, the court set an early date by which GHC would file a front-end motion for summary judgment and stayed discovery "unless the court grants a Rule 56(d) motion." Dkt. 12. GHC has now filed its contemplated motion, dkt. 13, and plaintiffs have filed their Rule 56(d) motion. Dkt. 23. Having considered both sides' submissions, I am denying plaintiffs' motion for discovery.

The general rule is that evidence beyond the administrative record is not permitted when the court reviews a claims administrator's denial of benefits under the "arbitrary and capricious" standard. Plaintiffs have failed to show that they qualify for an exception to this rule. As for their Parity Act claim, plaintiffs have failed to allege sufficient facts in their complaint from which it can be plausibly inferred that GHC denied their claims based on a treatment limitation that is separate from or more restrictive than those it applies to analogous medical treatment. However, as explained at the end of this order, I am giving plaintiffs an opportunity to amend their complaint before they respond to GHC's summary judgment motion if they wish to attempt to cure the deficiencies in their Parity Act claim.

The following facts are drawn from the administrative record, attached to GHC's motion, and they do not appear to be in dispute. I am setting them forth as background for purposes of deciding plaintiffs' Rule 56(d) motion. They do not reflect findings of fact by the court.

FACTUAL BACKGROUND

GHC is a non-profit, health maintenance organization that offers health insurance and oversees the administration of benefits provided under those health insurance plans.  Plaintiff Angela Midthun-Hensen enrolled herself, her husband (plaintiff Tony Hensen) and their daughter (K.H.) in an employer-sponsored health plan issued and overseen by GHC.  K.H. has been diagnosed with Autism Spectrum Disorder ("ASD").  This case concerns GHC's denial of coverage, from 2017-2019, for two kinds of treatments that the Midthun-Hensens sought for K.H.'s ASD:  (1) speech therapy and (2) occupational therapy.

GHC provides its members with a Plan Member Certificate that explains the terms, benefits, limitations and conditions of the group health plan.  Article III of the Member Certificate for plaintiffs' plan specifies that GHC had "the discretionary authority to determine eligibility for Benefits and to construe the terms of [the] Certificate" and that any such determination or construction would be final and binding on the parties unless arbitrary and capricious.

The Member Certificates for the years at issue provided that all services that were not "medically necessary" were excluded by the plan.  To be "medically necessary," a treatment had to be deemed, among other things, to be "appropriate under the standards of acceptable medical practice" to treat the member's illness, disease or injury.  The plan further provided that GHC, through its Medical Director, was authorized to make the determination whether a treatment was medically necessary and eligible for coverage under the plan, using criteria developed by recognized sources.

The Member Certificates provided that GHC's plan also excluded services that were "Experimental, Investigational, or Unproven." Those terms were defined, in part, as follows:

> [A] health service, treatment, or supply used for an illness or injury which, at the time it is used, meets one or more of the following criteria:
>
>  . . .
>
> b.  is not a commonly accepted medical practice in the American medical community;
>
>  . . .
>
> h.  lacks recognition and endorsement of nationally accepted medical panels;
>
> i.  does not have the positive endorsement of supporting medical literature published in an established, peer reviewed scientific journal;
>
>  . . .
>
> m.  reliable evidence shows that the consensus of opinion among experts regarding the treatment, procedure, device, drug or medicine is that further studies or clinical treatments are necessary to determine its . . . efficacy or efficacy as compared with standard means of treatment or diagnosis.  "Reliable evidence" shall include anything determined as such by GHC-SCW, within the exercise of its discretion, and may include published reports and articles in the medical and scientific literature generally considered to be authoritative by the national medical professional community, the written protocol(s) used by the treatment facility or the protocol(s) of another facility studying substantially the same treatment, procedure, device, drug or medicine; or the written informed consent used by the treatment facility or by another facility studying substantially the same treatment, procedure, device, drug or medicine . . .

All coverage otherwise provided by the plan–whether that coverage provided mental health benefits or medical/surgical benefits–was subject to exclusion if GHC determined that it was not "medically necessary" or that it was "experimental, investigational or unproven."

GHC's plan provided some coverage for both "intensive level" and "non-intensive level" treatment for ASD, as required by Wisconsin's autism mandate, Wis. Stat. § 632.895(12m).

The Member Certificates described the coverage for "intensive-level services" for the treatment of ASD, in part, as follows:

> **Intensive-Level Services** means evidence-based behavioral Autism Spectrum therapy (efficacious treatment) that is directly based on, and related to, a Member's therapeutic goals and skills as prescribed by a treating physician and provided by an Autism Qualified Provider, and when the prescribed therapy is for the treatment of Autism Spectrum Disorder, where the majority of treatment is provided in the Member's home where a parent or legal guardian is present and engaged in the therapy session(s) and meets the following requirements:
>
> > \* \* \*
> >
> > b.     Provides evidence-based intensive therapy, treatment, and services in an environment most conducive to achieving the goals of the Member's treatment plan;
> >
> > \* \* \*
> >
> > d.     Commences after the Member is two years of age and before the Member is nine years of age; and
> >
> > e.     Intensive-Level Services are provided for no more than four years regardless of the payer.

The Member Certificates described the coverage for non intensive-level services for the treatment of ASD, in part, as follows:

> **Non Intensive-Level Services** means evidence-based behavioral therapy that occurs after the completion of treatment with Intensive-Level services and that is designed to sustain and maximize gains made during Intensive-Level Services or, for the Member who has not and will not receive Intensive-Level Services, evidence-based therapy that will improve the Member's condition as prescribed by an Autism Qualified Provider when the prescribed therapy meets the following requirements:
>
> > \* \* \*
> >
> > b.     Provides evidence-based behavioral therapy, treatment, and services in an environment most conducive to achieving the goals of the Member's treatment plan;
> >
> > \* \* \*

The Member Certificates provided some coverage for outpatient rehabilitation therapies. However, they excluded outpatient rehabilitation therapies, including physical therapy, speech therapy, occupational therapy, and hearing treatments, when diagnosed for and used for the treatment of chronic brain injuries, including development delay, intellectual disability, and cerebral palsy. Sensory integration therapy (a type of occupational therapy used to treat autism) was not covered by the plan generally. In addition, GHC specifically excluded "sensory integration therapy" from coverage under its exclusions for ASD Services.

From 2017-2019, plaintiffs submitted seven requests for either speech or occupational therapy coverage for K.H.. K.H. turned 10 on March 9, 2018. GHC denied those requests on the ground that neither occupational therapy nor speech therapy for children over age 10 were evidence-based treatments for ASD, and therefore, were not covered by the plan. Plaintiffs appealed, supporting their requests with letters from K.H.'s providers attesting to the medical necessity of the treatments and with various medical literature that they argued showed the efficacy of the treatments in treating autism. However, GHC continued to adhere to its position that the treatments sought were not evidence-based and were excluded under the plan's exclusion for experimental and investigational treatment.

In rejecting plaintiffs' claims, GHC relied on CM.MED.121 ("Policy 121"), which reflects GHC's "guidelines used to determine eligibility for and coverage of" ASD services for GHC members. Under a section titled "Concomitant evidence-based therapies," Policy 121 stated: "Speech and language evaluations and therapy is not an evidence-based treatment for the core deficits of autism spectrum disorders for children ages 10 and above per (National Standards Project, National Autism Center (2015)) and is not a covered benefit." Dkt. 15-6, at 2.

6

Similarly, under the same section, Policy 121 stated: "Occupational therapy, including sensory integration therapy is not an evidence-based treatment for the core deficits of autism spectrum disorders (Social-communication deficits and repetitive/stereotyped behaviors) ((National Standards Project, National Autism Center (2015)) and is not a covered benefit." *Id*. at 3.

Since October 2020, however, GHC has approved claims, including those submitted by plaintiffs, for speech therapy for children 10 and older and for sensory integration occupational therapy, including pre-service requests submitted by plaintiffs on August 30, 2021. According to GHC, this policy change was the result of a 2020 report ("the EBP Report") issued by the National Clearinghouse on Autism Evidence and Practice Review Team, which reviewed available studies into the effectiveness of various treatments for ASD and identified which treatments were evidence-based practices. Based on new studies, the National Clearinghouse concluded that both sensory integration occupational therapy and certain speech and language treatments were evidence-based practices for the treatment of autism. GHC says that the 2020 EBP Report's determinations caused it to amend Policy 121.

Plaintiffs filed this suit on September 27, 2021, seeking to represent the following class:

> All participants, beneficiaries, subscribers and dependents enrolled in the GHC Large Group HMO Plans, Large Group POS Plans, and Large Group PPO Plans administered by GHC that contain an exclusion of coverage for applied behavioral analysis, speech therapy for children age 10 or older and/or occupational therapy whose requests for coverage for these services were denied by GHC based on Policy 121.

Complaint, dkt. 1, ¶57.

OPINION

GHC has moved for summary judgment on all claims. GHC argues that plaintiff's first claim, for recovery of benefits, must be denied because GHC reasonably determined that plaintiff's requests for speech and occupational therapy to treat K.H.'s ASD were not "evidence based" at the time. As for the plaintiffs' claim that GHC's denials violated the Federal Parity Act, GHC argues plaintiffs cannot state a viable cause of action because they have failed to identify any plan treatment limitations that do not apply equally to medical and to mental health services.[2] Finally, says GHC, plaintiffs' complaint for declaratory relief must be denied because GHC now is providing coverage.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding a motion for summary judgment, the court views the facts in the light most favorable to the non-moving parties. *Crull v. Sunderman*, 384 F.3d 453, 460 (7th Cir. 2004).

---

[2] GHC also contends that Count III, which alleges a violation of Wisconsin's autism mandate, Wis. Stat. § 632.895(12m), must be dismissed because GHC's health plan covers exactly what is prescribed by Wisconsin law, and in any case there is no private right of action under the statute. Although plaintiffs have not conceded this point, they do not address this state law claim in their Rule 56(d) motion or supporting materials.

In response to GHC's motion for summary judgment, plaintiffs have moved pursuant to Fed. R. Civ. P. 56(d) for an order allowing them to take discovery from GHC before they respond to GHC's motion.   Rule 56(d) provides that, after a party moves for summary judgment:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> > (1) defer considering the motion or deny it;
> >
> > (2) allow time to obtain affidavits or declarations or to take discovery; or
> >
> > (3) issue any other appropriate order.

A party seeking relief under Rule 56(d) cannot merely express a "a fond hope that more fishing might net some good evidence." *Smith v. OSF HealthCare Sys.*, 933 F.3d 859, 864–65 (7th Cir. 2019). *See also Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 885 (7th Cir. 2005) (affirming denial of 56(d) motion when plaintiffs' request was "based on nothing more than mere speculation"). Rather, a party must establish, by affidavit or declaration, "specific reasons" why it cannot respond to the motion unless discovery is extended.  *Id*.  "In addition, a court need not delay decision on a summary judgment motion to allow time for discovery on an obviously meritless claim or defense." *Id*. (citing *Arnold v. Villarreal*, 853 F.3d 384, 389 (7th Cir. 2017)).

Plaintiffs ask for discovery on both their improper denial of benefits claim and their Parity Act claim, which I will address separately:

### I. Count 1: Improper Denial of Coverage and Benefits

Citing to 29 U.S.C. § 1132(a)(1)(B), plaintiffs claim that GHC improperly denied them coverage and benefits. Compl., dkt. 1, at 18. As an initial matter, plaintiffs appear to agree with GHC's assertion that a claim brought under § 1132(a)(1)(B) is not a claim for breach of a fiduciary duty, as plaintiffs have styled it in their complaint. Rather, § 1132(a)(1)(B) allows an ERISA plan participant to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" Plaintiffs also do not dispute GHC's contention that, under the plan's terms, GHC had "the discretionary authority to determine eligibility for Benefits and to construe the terms of [the] Certificate." Finally, plaintiffs do not dispute that, where a plan administrator has such discretionary authority, the court reviews the decision under the arbitrary and capricious standard. *See Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 321 (7th Cir. 2007) ("[B]ecause the Plan's administrator does have discretionary authority, the court reviews Williams's denial of benefits under the arbitrary and capricious standard."); *Hackett v. Xerox Corp. Long–Term Disab. Income*, 315 F.3d 771, 773 (7th Cir. 2003) ("Where the plan does grant discretionary authority to the administrator, the court reviews the decision under the arbitrary and capricious standard.").

The dispute between plaintiffs and GHC is over what evidence the court may consider when it reviews the claims administrator's decision under this standard. GHC argues that the court is limited to reviewing the administrative record. Plaintiffs disagree, arguing that in order to defend against summary judgment on the wrongful-denial-of-benefits claim, they need to take discovery from GHC's decision-makers to "understand the reasoning process behind the coverage

decisions to determine if GHC acted in an arbitrary and capricious manner."  Pls. Br. in Supp., dkt. 24, at 20.

Discovery generally is not allowed in ERISA cases in which the administrator's decision is reviewed under the deferential "arbitrary and capricious" standard.  "Although parties may conduct discovery and present new evidence in ERISA cases on *de novo* review, evidence outside of the administrative record is not allowed 'where the question is whether a decision is . . . arbitrary and capricious.'"  *Schilling v. Epic Life Ins. Co.*, No. 13-CV-438-WMC, 2015 WL 856575, at *15 (W.D. Wis. Feb. 27, 2015) (quoting *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 982 (7th Cir. 1999)).

Like most rules, however, this one has exceptions.  If a plaintiff makes a prima facie showing of bias or conflict of interest by the decisionmaker, then courts sometimes allow discovery.  *Semien v. Life Ins. Co. of NA.*, 436 F.3d 805, 813 (7th Cir. 2006).  To qualify for this exception, the plaintiff must: (1) show a specific conflict or instance of misconduct; and (2) make a prima facie showing that there is good cause to believe that limited discovery will reveal a procedural defect.  *Gebert v. Thrivent Fin. for Lutherans Grp. Disability Income Ins. Plan*, No. 13-C-170, 2013 WL 6858531, at *2 (E.D. Wis. Dec. 30, 2013) (quoting *Warner v. Unum Life Ins. Co. of America*, 2013 WL 3874060, *3 (N.D. Ill. July 26, 2013)).  Moreover, "[e]ven where a structural conflict exists, the conflict is significant only when there is some 'likelihood that the conflict of interest influenced the decision.'"  *Dennison v. Mony Life Ret. Income Sec. Plan for Emps.*, No. 10-CV-338-BBC, 2011 WL 13130850, at *4 (W.D. Wis. Apr. 28, 2011) (quoting *Marrs v. Motorola, Inc.*, 577 F.3d 783, 789 (7th Cir. 2009)). "The ultimate question  . . . is whether this

is a 'run-of-the-mill' ERISA case or whether the Plaintiff can point to something that raises suspicions." *Gebert*, 2013 WL 6858531, at *2.

In their Rule 56(d) brief, plaintiffs do not even acknowledge this burden, much less attempt to meet it. As evidence of procedural irregularity, they point only to conclusory allegations in their complaint alleging that GHC saves money when it denies its members' benefits claims. Complaint, dkt. 1, ¶¶ 44-47. But as GHC points out, this type of conflict of interest exists in all cases in which the entity that makes the coverage decision also pays for the benefits, and is insufficient on its own to open the door to discovery. *See Dennison v. MONY Life Ret. Income Sec. Plan for Emps.*, 710 F.3d 741, 746 (7th Cir. 2013) (observing that "[t]here is a latent conflict of interest any time someone is asking for money from a company (from anyone, in fact)," but this would not be enough to subject benefits review officers to discovery); *Weddington v. Aetna Life Ins. Co.*, No. 15 C 1268, 2015 WL 6407764, at *3 (N.D. Ill. Oct. 21, 2015) ("We read *Dennison* as saying that a claimant  . . . cannot obtain discovery merely by pointing to a structural conflict, as that approach would open the door too broadly.")

Apart from their generic conflict-of-interest claim, plaintiffs argue primarily that they need discovery in order to determine whether GHC actually reviewed all the providers' reports and medical literature that plaintiffs submitted in support of their claim that the sought-after treatment was not experimental and investigational, and, if so, why GHC rejected it. As stated in plaintiffs' counsel's affidavit: "To determine whether GHC was simply going through the motions to substantiate a denial of coverage it had already determined to make, K.H. must identify and depose the decision-makers in the case to determine if they really exercised discretion or ignored the information set forth by K.H." Aff. of Paul Kinne, dkt. 25, ¶ 10.

However, the mere fact that plaintiffs adduced substantial evidence in support of their claim is not enough to make a prima facie showing of a procedural defect. As the *Gebert* court observed,

> if it were enough to cite medical evidence supportive of a benefits claim, then *every* case would justify opening the doors to discovery. Instead, unless something about the merits of the claim jumps off the page, the mere fact that the plaintiff's own physicians supported her claim is not enough to raise the specter of impropriety.

*Id.*, 2013 WL 6858531, at *3.

Moreover, plaintiffs' argument that they are entitled to know *why* GHC ultimately was not persuaded by their evidence misunderstands a claims administrator's obligations under ERISA. As the Seventh Circuit explained in *Gallo v. Amoco Corp.*, 102 F.3d 918 (7th Cir. 1996),

> [a]ll [the claims administrator] has to give the applicant is the reason for the denial of benefits; he does not have to explain to him why it is a *good* reason. To require that would turn plan administrators not just into arbitrators, for arbitrators are not usually required to justify their decisions, but into judges, who are.

*Id*., at 923. If GHC were to have failed to plainly articulate its grounds for its decision or were to have offered shifting or incomplete explanations, then plaintiffs can use that to argue that GHC's decision was arbitrary and capricious. *See id*. ("An administrator who fails to articulate his grounds runs the risk that a court will find that he has no grounds[.]"). But plaintiffs cannot use any such failures or position shifts as a basis to obtain discovery about the "mindset" of the decision-makers.

In a strained attempt to call GHC's good faith into question, plaintiffs point to facts that seem to have nothing to do with this case. First, they argue that it is "odd" that GHC purported to consider whether the speech and occupational therapy treatments sought by plaintiffs were "evidence-based" because, under the policy's coverage terms, "intensive-level therapy" is not

covered after age 9, whether it is evidence-based or not.  Reply Br., dkt. 30, at 2.  Plaintiffs surmise from this purported "oddity" that GHC must have been trying to "cover up" something. This argument is both confusing and unconvincing.  Nothing in the administrative record suggests that *anyone*, even the plaintiffs, thought the speech or occupational therapy plaintiffs were seeking would be covered as an "intensive level" service.[3]  To be covered, such services had to meet various criteria, including that they were provided (a) primarily in the home, (b) with a parent present and engaged in the sessions, and (c) averaged at least 20 hours a week.  *See* dkt. 15-2, Art. V, § C(1).  The supporting documents submitted with plaintiffs' claims indicate that they were seeking occupational therapy 1-2 times a week, and speech and language therapy one time per week for 60-minute sessions, far short of the 20 hours/week average for intensive-level services.  *See, e.g.*, dkt. 17-1, at 22; dkt. 17-3, at 9-10.

What is more, according to the Occupational Therapy Evaluation conducted by CI Pediatric Centers, by July 28, 2017, K.H. already *had* "received five years of intensive behavioral services through Wisconsin Early Autism Project, which were recently discontinued due to insurance."  Dkt. 17-1, at 13.  GHC's policy provided that coverage for such services was available for only 48 months.  *See* Dkt. 15-2, Art. V, § C(1).[4]  Assuming the accuracy of the historical facts provided in the OT evaluation–and plaintiffs have cited no evidence to suggest otherwise–this means that the *only* autism-related services for which K.H. could have been eligible at the time of the contested denials in this case were non-intensive or "concomitant"

---

[3] Notably, Policy 121 identified speech and occupational therapy as a "concomitant" therapy to intensive or non-intensive level behavioral services.

[4] I do not understand plaintiffs to be challenging this cutoff, which is consistent with Wisconsin's autism mandate.  Wis. Adm. Code § Ins. 3.36(4)(b)("Insurers and self-insured health plans shall provide up to forty-eight months of intensive-level services [for treatment of ASD].").

services.  Indeed, plaintiffs themselves appear to have recognized as much:  a letter from their personal representative in support of their March 2019 appeal referred only to the plan's coverage for "non-intensive services."   3/5/19 Letter from Heather Morris, dkt. 17-5, at 7. Perhaps I am missing something, but it appears that the terms of the "intensive level services" provision are irrelevant to this case.

Similarly misplaced is plaintiffs' argument that discovery is necessary because the facts of this case "unfolded at the same time courts in other parts of the country were ordering insurers to cover [Applied Behavioral Analysis] therapy."  As an initial matter, it is not at all clear that the speech and occupational therapy treatment K.H. was seeking was the same as or equivalent to Applied Behavioral Analysis therapy.  Moreover, the sole case plaintiffs cite, *McHenry v. PacificSource Health Plans*, 679 F. Supp. 2d 1226, 1239 (D. Or. 2010), does not advance their position.  The coverage sought in *McHenry* was for a child with autism under the age of 10 (he began ABA therapy when he was two), for which there was a wealth of studies and medical literature supporting the effectiveness of ABA therapy to treat autism.  *Id*. at 1238. Nothing in *McHenry* addresses speech or occupational therapy, much less their effectiveness in treating children with ASD over age 9.  Accordingly, the *McHenry* decision does not support an inference of malfeasance by GHC (if this is what plaintiffs are attempting to suggest) such that plaintiffs should be allowed to take discovery from GHC's decision-makers.

Finally, plaintiffs assert that discovery is necessary to find out whether GHC considered whether there was medical evidence to support approving the requested therapy as a "non-intensive-level service" rather than an intensive level service.  Aff. of Paul Kinne, dkt. 25, ¶ 13. Again, there is no evidence that *anyone* thought plaintiffs were seeking "intensive level" service,

15

but in any case, GHC's alleged failure to consider whether the therapies might be covered under a different treatment category or coverage provision does not show that GHC was biased or otherwise raise the "specter of impropriety."  Plaintiffs' argument might help them show that GHC acted *unreasonably*, but they can make that argument without deposing the decision-makers.

In sum, plaintiffs have failed to make a prima facie showing of a conflict of interest or other impropriety on GHC's part that would warrant granting an exception to the general rule that limits review in this case to the evidence in the administrative record.  Accordingly, their motion for discovery with respect to the first count of the complaint is denied.

## II.  Count II:  Federal Parity Act Claim

In Count II, plaintiffs allege that GHC's coverage denials violated the Paul Wellstone and Pete Dominici Mental Health Parity and Addiction Equity Act of 2008 (the "Parity Act,"), an ERISA amendment codified at 29 U.S.C. § 1185a.  The parties appear to agree that the Parity Act is enforceable through a cause of action under 29 U.S.C. § 1132(a)(3).  *See Christine S. v. Blue Cross Blue Shield of New Mexico*, 428 F. Supp. 3d 1209, 1219-20 (D. Utah 2019) (plaintiffs could enforce their Parity Act rights only through § 502(a)(3) or ERISA, not § 502(a)(1)(B)); *Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1259 n.118 (D. Utah 2016) (finding Parity Act enforceable through a cause of action under 29 U.S.C. § 1132(a)(3)); *accord Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996) (describing Section 502(a)(3) as a "catchall...[that] offer[s] appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere

adequately remedy.").  In its motion for summary judgment, however, GHC argues that this claim must be dismissed because plaintiffs have failed to plausibly allege a Parity Act violation.

The Parity Act was "designed to end discrimination in the provision of [insurance] coverage for mental health and substance use disorders as compared to medical and surgical conditions . . ." *Coal. for Parity, Inc. v. Sebelius*, 709 F.Supp.2d 10, 13 (D.D.C.2010). Under the statute, ERISA plans that choose to offer mental health coverage must ensure that:

> the treatment limitations applicable to ... mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan ... and there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits.

29 U.S.C. § 1185a(a)(3)(A)(ii).  "Put simply, the Parity Act prohibits the imposition of more stringent treatment limitations for mental health treatment than for medical treatment." *Bushell v. UnitedHealth Grp. Inc.*, No. 17-CV-2021 (JPO), 2018 WL 1578167, at *4 (S.D.N.Y. Mar. 27, 2018).

The Parity Act defines "treatment limitations" as including "limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment."  *Id*.  Regulations promulgated by the Departments of Labor, Health and Human Services, and Treasury clarify that treatment limitations should be scrutinized with respect to certain classifications of treatment: (1) inpatient, in-network; (2) inpatient, out-of-network; (3) outpatient, in-network; (4) outpatient, out-of-network; (5) emergency care; and (6) prescription drugs.  29 C.F.R. § 2590.712(c)(2)(ii). If a plan provides medical benefits within a certain classification, it cannot impose more stringent limitations on a mental health benefit within the same classification.

Additionally, the Parity Act regulations explain that the Act applies to "nonquantitative" treatment limitations (NQTLs), which are limitations that are not expressed numerically, but "otherwise limit the scope or duration of benefits for treatment." 29 C.F.R. § 2590.712(a). Examples of NQTLs include limitations on geographic location, facility type, drug formulary design, provider network admission, step therapies, and other similar medical management program design elements. 29 C.F.R. § 2590.712(c)(4)(ii). With respect to NQTLs, the implementing regulations mandate that "any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health . . . benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other facts used in applying the limitation with respect to medical/surgical benefits in the same classification." 29 C.F.R. § 2590.712(c)(4)(i). In other words, "[p]lans need not apply the *same* limitations to all benefits; rather, 'the processes, strategies, evidentiary standards, and other factors plans use[ ] to impose those limitations [have] to be *comparable* for all benefits.'" *Alice F. v. Health Care Serv. Corp.*, 367 F. Supp. 3d 817, 827–28 (N.D. Ill. 2019) (emphasis in original) (internal quotation and citation omitted).

As district courts in this circuit and elsewhere have observed, "'there is no clear law on how to state a claim for a Parity Act violation,' and as a result, 'district courts have continued to apply their own pleading standards.'" *Smith v. Golden Rule Ins. Co.*, 526 F. Supp. 3d 374, 386 (S.D. Ind. 2021) (quoting *Michael W. v. United Behav. Health*, 420 F. Supp. 3d 1207, 1234 (D. Utah 2019)); *see also Rula A.-S. v. Aurora Health Care,* No. 20-cv-1816-JPS, 2021 WL 3116143, at *3 (E.D. Wis. July 22, 2021) (observing same). Although these various pleading standards differ somewhat, courts generally agree that a plaintiff bringing a Federal Parity Act claim is not

restricted to showing that the plan *expressly* discriminates against mental health or substance abuse treatment (*i.e.* a facial claim), but may also challenge a coverage provision "as applied," that is, by showing that a facially neutral coverage term is applied disparately in practice. *Smith*, 526 F. Supp. 3d at 389 (" Mr. Smith need not identify a treatment limitation expressly outlined in the Policy that applies to mental health or substance abuse treatment but not to medical or surgical treatment; it is enough for him to allege that the facially neutral medical necessity requirement is applied disparately in practice."); *Rula A.-S.*, 2021 WL 3116143, at *4 (agreeing with *Smith*); *Michael W.*, 420 F. Supp. 3d at 1238 ("Plaintiffs have plausibly pleaded that, for outdoor behavior treatment programs, which in practice are only available to those seeking mental health/substance abuse care, Defendants' policy of excluding outdoor behavior therapy from coverage is because of more restrictive criteria that is not applied to analogous medical/surgical care.").  In the end,

> [t]he ultimate question in any Parity Act case is whether the plaintiff has plausibly alleged that his health insurance plan applies a separate or more restrictive treatment limitation to mental health and substance abuse services versus medical and surgical services, and the different standards merely provide a framework for considering that question as it relates to the different types of Parity violations, including facially disparate treatment, categorical exclusions, and as-applied challenges.

*Smith*, 526 F. Supp. 3d at 388–89.

In arguing for summary dismissal of plaintiffs' Parity Act claim, GHC argues that plaintiffs' complaint does not allege either a facial or as-applied Federal Parity Act violation.  As GHC points out, the complaint contains only one paragraph, ¶ 49, that resembles the elements of a Parity Act claim.  There, plaintiffs allege that restricting coverage of speech therapy to children under age 10 was a treatment limitation on mental health benefits, and that GHC's

plan placed no similar treatment limitation on medical/surgical benefits.  Complaint, dkt. 1, ¶ 49.  But GHC says this claim is "flawed" because it misstates the actual treatment limitation that GHC applied in denying plaintiffs' requests for speech therapy.[5]  According to GHC, its plan did *not* have a "treatment limitation" defined by age; rather, "it restricted coverage to those treatments with sufficient evidentiary support, and, in this instance, evidentiary support only existed for a certain age range [under 10]."  *Id*.

In their Rule 56(d) motion, plaintiffs offer no response to GHC's characterization of the treatment limitation it applied to deny plaintiffs' request for speech therapy for K.H.  Nevertheless, plaintiffs continue to insist that the plan "applies a separate age-based treatment limitation where the therapy is sought to treat autism."  Br. in Supp. of Rule 56(d) Mot., dkt. 24, at 10.  Based on their record citations, it appears that plaintiffs are relying, once again, on the plan's coverage for "intensive-level services" to treat autism, and its provision that such services are available only between the ages of 2 and 9.  As explained in the preceding section, however, nothing in the administrative record suggests that the requested speech therapy and occupational therapy constituted an "intensive-level service" or would otherwise have been covered under this provision but for K.H.'s age.  Once again, it is puzzling why plaintiffs are focused on a plan provision that has no relevance to this case.

---

[5] GHC also presents evidence that it *does* restrict coverage for medical benefits when outside guidance recommends such benefits only for certain ages.  For example, it says, the Plan's coverage for "evidence-based" preventative services was set based on the United States Preventive Services Task Force's recommendations concerning the ages for which such services should be provided.  Plaintiffs argue that screenings and therapy are not necessarily comparable or in the same "classification," and that they need discovery to "probe these issues" to respond to the summary judgment motion.  In light of my conclusion that plaintiffs have yet to plead a plausible claim under the Parity Act, I do not address plaintiffs' request for discovery on this topic, nor have I considered it in deciding this motion.

Moreover, even if I assume that plaintiffs could state a plausible Parity Act claim based on the age limitation in the "intensive-level services" provision (and show that they have standing to assert such a claim), plaintiffs have failed to make a convincing argument why they need discovery.  In the supporting affidavit, counsel states merely that "K.H. must conduct discovery to determine if the age restrictions are more restrictive for ASD [than for medical/surgical limitations for which GHC does use age limits], and she must gather facts to ensure that the restrictions are being compared across common classifications."  Aff. of Paul Kinne, dkt. 25, ¶ 7.  However, given that plaintiffs appear to be asserting a facial challenge based on the explicit terms of the plan (the age restriction for intensive-level services), plaintiffs should be able to discern the information they seek from the plan documents.  At the very least, plaintiffs should be able to mesh the plan documents with the numerous district court cases addressing the elements of a Parity Act claim to articulate a theory of relief under the Parity Act that raises their right to relief "above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The current complaint  fails to do so: it contains but a single bare-bones allegation about speech therapy that plaintiffs apparently no longer are pursuing,.

Perhaps recognizing the flaws in their age restriction theory, plaintiffs raise an entirely new theory based on the plan's exclusion for sensory integration therapy.  Plaintiffs assert:

> The plan includes a treatment limitation for autism, including but not limited to exclusion for sensory integration therapy.  To determine the classification into which the limitation is placed, and to determine if the limitations are applied only to mental health or if the restriction is more restrictive than restrictions applied to medical/surgical benefits, K.H. must be able to determine facts to establish comparable classifications (if it can be done at all).  K.H. must also be able to determine if the limitations on ASD coverage separately applied only to mental health.  K.H. must also be able

> to seek information to establish the scope of restrictions for
> medical/surgical benefits so she can compare them.

> Aff. of Kinne, dkt. 25, ¶ 6.

In their supporting brief, plaintiffs note that courts have found Parity Act violations where a

plan has a blanket exclusion that applies exclusively to mental health conditions.  *See, e.g., Doe*

*v. United Behav. Health*, 523 F. Supp. 3d 1119, 1128 (N.D. Cal. 2021) (plan's exclusion for

"Intensive Behavioral Therapies such as Applied Behavior Analysis for Autism Spectrum

Disorders" violated Parity Act because, "[o]n its face, the  . . . exclusion creates a separate

treatment limitation applicable only to services for a mental health condition (Autism).")*; A.F.*

*ex rel. Legaard v. Providence Health Plan*, 35 F. Supp. 3d 1298, 1303 (D. Or. 2014) (finding facial

Parity Act violation where, in spite of offering coverage for autism, insurer denied ABA treatment

based on plan's Developmental Disability Exclusion, which applied "specifically and exclusively

to mental health conditions").

But in these (and other) "categorical exclusion" cases, the exclusions at issue applied "on

their face" only to mental health conditions, with no corresponding limitation on treatment for

medical conditions.  *Bushell v. UnitedHealth Grp. Inc.*, No. 17-CV-2021 (JPO), 2018 WL

1578167, at *5 (S.D.N.Y. Mar. 27, 2018) (insurer categorically excluded nutritional counseling

for all eating disorders yet offered nutritional counseling for some medical conditions, like

diabetes); *V. v. Health Care Serv. Corp.*, No. 15 C 09174, 2016 WL 4765709, at *6 (N.D. Ill.

Sept. 13, 2016) (group health plan categorically excluded expenses for residential treatment

centers for mental illness but covered expenses for comparable treatment settings for physical

illness); *Craft v. Health Care Serv. Corp.*, 84 F. Supp. 3d 748, 749 (N.D. Ill. 2015) (same).

In the instant case, while GHC's plan specifically excludes sensory integration therapy from its coverage for ASD, GHC's plan *also* excludes coverage for sensory integration therapy *in general*. So the cases involving separate treatment limitations for mental health services do not advance plaintiffs' position.

What is more, GHC does not even appear to have *relied* on the plan's categorical exclusion for sensory integration therapy when it denied coverage to plaintiffs. Rather, GHC denied coverage based on its determination that occupational therapy for the treatment of ASD was not evidence-based and that it was not covered under the plan's exclusion for experimental and investigational treatments. It is not clear, therefore, whether plaintiffs would even have standing to assert a Parity Act violation based on the categorical exclusion for sensory integration therapy.

In any case, all of this discussion is academic: plaintiffs' complaint says nothing about the sensory integration therapy exclusion. I will not permit plaintiffs to take discovery on a claim they have not pled.

Finally, plaintiffs say they need discovery to "learn whether a claim for coverage, coupled with reams of research and pleas from K.H.'s own health care providers, was treated in the same manner as requests for treatment coverage for medical/surgical treatments." Dkt. 24, at 12. But plaintiffs have cited no authority to suggest that the Parity Act, which demands parity among "treatment limitations," applies to the administrative appeals process. Therefore, this request is denied.

In sum, because plaintiffs' complaint fails to state a plausible claim for relief under the Parity Act, they are not entitled to discovery on that claim. However, I will allow plaintiffs an

23

opportunity to amend their complaint solely with respect to their Parity Act claim.  If, after a diligent review of the case law and the plan documents, plaintiffs choose to take this path, then they must file their amended complaint not later than May 27, 2022.  If plaintiffs do not file an amended complaint, then their Parity Act claim will be dismissed, and plaintiffs must respond to the pending motion for summary judgment on the denial-of-benefits claim not later than June 6, 2022.  If plaintiffs do file an amended complaint, then GHC will have until June 23, 2022 in which to either (a) file an updated motion for summary judgment, or (b) withdraw the motion for summary judgment, without prejudice to refiling it after the parties have had an opportunity to take discovery on the Parity Act claim.  The court will set additional deadlines as necessary, depending on which course this proceeding takes.

## ORDER

IT IS ORDERED that:

1.   Plaintiffs' motion pursuant to Fed. R. Civ. P. 56(d) to defer consideration of the pending motion for summary judgment and permit them to take discovery, dkt. 23, is GRANTED in part and DENIED in part, as stated below.

2.   Plaintiffs have until May 27, 2022 in which to file an amended complaint with respect to their claim brought pursuant to the Federal Parity Act.

3.   If plaintiffs do not file an amended complaint by May 27, 2022, then their Parity Act claim will be dismissed, and plaintiffs must respond to the pending motion for summary judgment on the denial-of-benefits claim not later than June 6, 2022.

4.   If plaintiffs do file an amended complaint, then GHC has until June 23, 2022 in which to either (a) file an updated motion for summary judgment, or (b) withdraw the motion for summary judgment, without prejudice to refiling it after the parties have had an opportunity to take discovery on the Parity Act claim.

5.      If GHC chooses option (a), above, then the court will set 21/10 response/reply
        deadlines for the summary judgment motion.  If GHC chooses option (b), then
        the court will set a telephonic status conference to revisit the schedule in this case,
        including the deadline for Rule 23 motions.


Entered this 6th day of May, 2022.

                                        BY THE COURT:

                                        /s/
                                        _____
                                        STEPHEN L. CROCKER
                                        Magistrate Judge