## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

**ANGELA MIDTHUN-HENSEN and TONY HENSEN,**
as representatives of their minor daughter, **K.H.,**
and on behalf of all others similarly situated**,**

        Plaintiffs,

    v.                                   **Case No. 3:21-cv-00608**

**GROUP HEALTH COOPERATIVE OF
SOUTH CENTRAL WISCONSIN,**

        Defendant.

## PLAINTIFFS' BRIEF IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT

NOW COME the Plaintiffs, by and through their attorneys Gingras, Thomsen & Wachs, LLP, by attorney Paul A. Kinne, who hereby respond to the Motion for Summary Judgment as follows:

### STATEMENT OF FACTS

Autism Spectrum Disorder ("ASD") is defined by the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed.; American Psychiatric Association, 2013). PPFOF para. 1.  The diagnosis of ASD is characterized by persistent deficits in social communication and social interaction across multiple contexts. PPFOF para. 1.  ASD is manifested by deficits in social-emotional reciprocity, deficits in non-verbal communication behaviors used for social interaction, and deficits in developing, maintaining, and understanding relationships. PPFOF para. 1. The

severity of ASD is based on social communication impairments and restrictive, repetitive patterns of behavior. PPFOF para. 1.

K.H. is over the age of ten and has the primary diagnosis of ASD. PPFOF para. 2.  K.H. has been diagnosed with Autism Spectrum Disorder ("ASD"). PPFOF para. 2. K.H.'s autism symptoms include developmental speech delay, inadequate social skills, and poor motor planning and function. PPFOF para. 2. K.H. works hard to gain skills that are easily attainable by her peers. PPFOF para. 2. Due to her ASD, she struggles with the daily tasks of dressing, personal hygiene, social interaction, and other common every-day activities. PPFOF para. 2. Her lack of social awareness and speech comprehension impede her ability to make friends. PPFOF para. 2.

For the times relevant to this case, K.H.'s health care providers continuously recommended that she receive treatment called Applied Behavioral Analysis ("ABA") for her ASD. PPFOF para. 3.  Since K.H. turned ten, ABA was generally accepted in the medical community as an effective form of treatment for minors (defined as under age 22 by Wisconsin law) with ASD. PPFOF para. 4. ABA is a type of therapy that focuses on improving specific maladaptive or stereotypic behaviors and targets social skills and adaptive learning skills. PPFOF para. 5. The American Academy of Child and Adolescent Psychiatry ("AACAP") empirical reports state that of all clinical, non-educational interventions, ABA has been the most widely shown in scientific research to improve the ability of autism patients to adapt to their environment and engage with those around them. PPFOF para. 6.

K.H. had been receiving ABA to treat her ASD symptoms. PPFOF para. 7. She started speech therapy in May 2017 and continued to make progress. PPFOF para. 7. K.H.'s speech therapist recommended that K.H. have an Occupational Therapy ("OT") Evaluation and treatment to address the delays K.H. experiences in developing her motor and self-help skills. PPFOF para. 8. As a result of the assessment and K.H.'s providers' direction, K.H. requested GHC—the health-funded cooperative association and group health plan administrator for Plaintiffs' Plan, described more fully below—to approve OT treatment for K.H. in October 2018. PPFOF para. 9.

Children with ASD have a range of occupational performance challenges that interfere with their meaningful participation in school, home, and social activities. PPFOF para. 10. A predominant characteristic of autism that is often the focus of intervention is the child's sensory processing of another person's gestures to communicate or to relate to others with eye contact. PPFOF para. 11. Occupational therapists focus on enhancing a child's sensory processing, social behavioral performance, self-care, and participation in play. PPFOF para. 12. The role of OT in the treatment of children with ASD is structured as an intervention associated with activities of daily living. PPFOF para. 13. This treatment includes therapy addressing the child's ability to get dressed by themselves and engage in personal hygiene, with a particular focus on increasing the child's ability to live more independently and decrease the need for one-on-one assistance. PPFOF para. 14. The foundational skills of OT allow children to participate in other critical

development activities, such as education and play. PPFOF para. 14. A child's successful completion of OT enhances a pathway for children to develop life skills, modulate behavior, and participate in social interaction. PPFOF para. 15.

Children with autism present problems in receptive, expressive, and pragmatic language. PPFOF para. 16. Because deficits in language and communication are acknowledged impediments to a child's progress in education and social settings, children with autism benefit from speech and language therapy. PPFOF para. 17.

GHC is a Wisconsin health-funded cooperative association organized for its members, which include school districts. PPFOF para. 18. GHC is a non-profit, health maintenance organization that offers health insurance and oversees the administration of benefits provided under those health insurance plans. GHC's health plans are regulated by the Commissioner of Insurance, State of Wisconsin. PPFOF para. 18. GHC also acts as the administrator of the group health plans that it sells to various entities. GHC's health plan covers services that are "medically necessary," which is defined as those services that are consistent with generally accepted standards of medical practices. PPFOF para. 18.

As the Administrator for the Policy and other Plans issued by GHC, all responsibility for making final and binding coverage determinations under the Policy and plans belongs to GHC. PPFOF para. 19.

Plaintiff K.H. is the teenaged daughter and dependent of Angela Midthun-Hensen and Tony Hensen. PPFOF para. 20. Angela Midthun-Hensen is a subscriber

and beneficiary, as defined by ERISA (Section 3(8), 29 U.S.C. §1002(a)) of the GHC Welfare Benefit Plan. PPFOF para. 20.  Plaintiff Angela Midthun-Hensen enrolled herself, her husband (plaintiff Tony Hensen) and their daughter (K.H.) in an employer-sponsored health plan issued and overseen by GHC. PPFOF para. 20. Angela Midthun-Hensen, Tony Hensen, and K.H. are insured as beneficiaries under the GHC Large Employer Group Health Policy ("Policy"). PPFOF para. 20. The Policy is a cooperative self-funded large group policy sponsored by Plaintiffs' employer, Verona Area School District. The 2018 HMO Large Employer Group Plan is governed by ERISA and is administered by GHC. PPFOF para. 20.

Under the Plaintiffs' insurance policy's Certificate of Coverage, both speech therapy and OT are included as benefits for children diagnosed with autism. PPFOF para. 21. K.H.'s treatment has been provided by qualified providers. PPFOF para. 22. These providers have created treatment plans to develop K.H.'s ability to function in social, communication, and functional skills. PPFOF para. 23. She made progress toward her stated goals and the speech therapy and OT was successful in addressing the core characteristics of her autism. PPFOF para. 24.

GHC provides its members with a Plan Member Certificate that explains the terms, benefits, limitations and conditions of the group health plan. PPFOF para. 25. Article III of the Member Certificate for plaintiffs' plan specifies that GHC had "the discretionary authority to determine eligibility for Benefits and to construe the terms of [the] Certificate" and that any such determination or construction would be final and binding on the parties unless arbitrary and capricious. PPFOF

para. 25.

The Member Certificates for the years at issue provided that all services that were not "medically necessary" were excluded by the plan. P P F O F   p a r a . 2 6 .  The plan further provided that GHC, through its Medical Director, was authorized to make the determination whether a treatment was medically necessary and eligible for coverage under the plan, using criteria developed by recognized sources. PPFOF para. 26.

The Member Certificates provided that GHC's plan excluded services that were "Experimental, Investigational, or Unproven." PPFOF para. 27. Those terms were defined, in part, as follows:

> [A] health service, treatment, or supply used for an illness or injury which, at the time it is used, meets one or more of the following criteria:
>
> . . .
>
> b. is not a commonly accepted medical practice in the American medical community;
>
> . . .
>
> h. lacks recognition and endorsement of nationally accepted medical panels;
>
> i. does not have the positive endorsement of supporting medical literature published in an established, peer reviewed scientific journal;
>
> . . .
>
> m. reliable evidence shows that the consensus of opinion among experts regarding the treatment, procedure, device, drug or medicine is that further studies or clinical treatments are necessary to determine its . . . efficacy or efficacy as compared with standard means of treatment or diagnosis. "Reliable evidence" shall include anything determined as such by GHC-SCW, within the exercise of its discretion, and may include published

> reports and articles in the medical and scientific literature generally considered to be authoritative by the national medical professional community, the written protocol(s) used by the treatment facility or the protocol(s) of another facility studying substantially the same treatment, procedure, device, drug or medicine; or the written informed consent used by the treatment facility or by another facility studying substantially the same treatment, procedure, device, drug or medicine . . . PPFOF para. 27.

All coverage otherwise provided by the plan–whether that coverage provided mental health benefits or medical/surgical benefits–was subject to exclusion if GHC determined that it was not "medically necessary" or that it was "experimental, investigational or unproven." PPFOF para. 28.

GHC's plan provided some coverage for both "intensive level" and "non-intensive level" treatment for ASD, as required by Wisconsin's autism mandate, Wis. Stat. § 632.895(12m). PPFOF para. 29.

The Member Certificates provided some coverage for outpatient rehabilitation therapies. PPFOF para. 30. However, they excluded outpatient rehabilitation therapies, including physical therapy, speech therapy, occupational therapy, and hearing treatments, when diagnosed for and used for the treatment of chronic brain injuries, including development delay, intellectual disability, and cerebral palsy. Sensory integration therapy (a type of occupational therapy used to treat autism) was not covered by the plan generally. P P F O F   p a r a .   3 0 . In addition, GHC specifically excluded "sensory integration therapy" from coverage under its exclusions for ASD Services. PPFOF para. 30.

The GHC policy provided coverage for "Complementary Medicine." PPFOF para. 31.  According to the policy, complementary medicine included forms of therapy used alone or combination with standard / conventional medicine. PPFOF para. 32. Such treatments included, but were not limited to: acupuncture, homeopathy, naturopathy, "energy work," "various types of eastern practices," movement therapy, wellness classes and lifestyle change classes. PPFOF para. 32. Complementary Medicine is listed as a "Covered Health Service" with no prior authorization required. PPFOF para. 33. Specifically, the policy states that Complementary Medicine professional services, when provided by an In-Network Provider designated to provide Complementary Medicine Services, were covered. PPFOF para. 33.  However, cost sharing might apply. PPFOF para. 33.

The policy defines Outpatient Habilitation Services as "Medically Necessary outpatient health care services that assist an individual in partially or fully acquiring or improving skills and functioning for daily living and that are necessary to address a health condition to the extent possible for daily living." PPFOF para. 34.

The policy also addressed Chiropractic Services. The policy covered those medically necessary services when provided by a chiropractor designated by GHC. PPFOF para. 35. The policy defined "medically necessary" to cover situations where the member has a neuromusculoskeletal disorder; the medical necessity for the treatment is clearly documented; and improvement is documented within the initial two weeks of chiropractic care. PPFOF para. 35.

"Medically Necessary" is defined under the policy as a service, treatment, procedure, equipment, drug, device or supply provided by a Hospital, Provider or other health care Provider that is required to identify or treat a Member's illness, disease or injury. PPFOF para. 36. It must also be determined by the Medical Director to be consistent with symptoms or diagnosis, appropriate under the standards of acceptable medical practice, not solely for the convenience of interested parties, and the most appropriate service. PPFOF para. 36. If more than one approach is acceptable, then GHC makes the determination on the approach that will be covered. PPFOF para. 36. Chiropractic treatment directed at pediatric patients (less than 18 years of age) is considered medically necessary when the treatment is directed at a clearly defined neuromusculoskeletal condition for which spinal manipulation therapy is an appropriate intervention. PPFOF para. 36.

In a review of studies conducted in 2015, the superiority of chiropractic treatment for neck pain to conventional exercise treatment and other physiotherapy procedures was not supported by rigorous trial data. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4591574/ PPFOF para. 37. For the treatment of back pain (spinal manipulation), the effectiveness of chiropractic care was not supported by compelling evidence from the majority of randomized clinical trials. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4591574/ PPFOF para. 38. The same was true for chiropractic care for upper extremity medical conditions. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4591574/ PPFOF para. 38. Reviews from 2002 and 2010 also called into question the effectiveness of chiropractic care

for adolescents. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2890688/; https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2890688/; https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2794701/. PPFOF para. 39.

Acupuncture, homeopathy, naturopathy, "energy work," "various types of eastern practices," movement therapy, wellness classes and lifestyle change classes were covered under the policy. PPFOF para. 40. A serious debate exists with respect to whether these treatments are "evidence based." PPFOF para. 41. Consider:

- Acupuncture.https://www.nccih.nih.gov/health/acupuncture-in-depth; PPFOF para. 41.

- Homeopathy. https://www.nhs.uk/conditions/homeopathy/#:~:text=The%20evidence%20on%20the%20effects%20of%20homeopathy&text=In%202010%20the%20House%20of,can%20also%20help%20treat%20them PPFOF para. 41.

- Naturopathy.https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1140750/ PPFOF para. 41.

GHC's plan covers homeopathy as long as the "care" is provided by an in-network provider. PPFOF para. 42. Homeopathy is a medical system based on the belief that the body can heal itself. Those who practice it use tiny amounts of natural substances, like plants and minerals. They believe these stimulate the healing process. https://www.webmd.com/balance/what-is-homeopathy#:~:text=Homeopathy%20is%20a%20medical%20system,the%20late

%201700s%20in%20Germany. PPFOF para. 43.

In January 2019, GHC denied Plaintiffs' request for coverage for K.H.'s Speech and Language Therapy ("speech therapy"). PPFOF para. 44. GHC stated its reason for denial was that speech therapy is not evidence-based treatment for the core deficits of ASD for children ages ten and above, and, accordingly, speech therapy is not a covered benefit under the terms of the group policy. PPFOF para. 44.

The same month, on January 4, 2019, GHC issued its decision denying coverage of OT for K.H.'s autism. PPFOF para. 45. The reason GHC stated for denial was that OT for treating ASD is considered experimental and investigational because it is not an evidence-based treatment for autism. PPFOF para. 45. Accordingly, GHC excluded OT from coverage under the terms of the Plaintiffs' group health benefits package. PPFOF para. 45.

The Plaintiffs' subsequent appeals of these denials for both speech therapy and OT were denied by GHC. PPFOF para. 46. K.H.'s request for external review under the terms of the group policy was rejected on the grounds that speech therapy and OT for K.H. were not covered benefits under the terms of the Plaintiffs' group policy. PPFOF para. 46.

GHC stated that the criteria it used as the premise for denying speech therapy and OT coverage was its own medical policy, GHC-SCW Medical Policy CM.121 ("Policy 121"). PPFOF para. 47. In rejecting plaintiffs' claims, GHC relied on CM.MED.121 ("Policy 121"), which reflects GHC's "guidelines used to determine

eligibility for and coverage of" ASD services for GHC members. P P F O F  p a r a . 48. Under a section titled "Concomitant evidence-based therapies," Policy 121 stated: "Speech and language evaluations and therapy is not an evidence-based treatment for the core deficits of autism spectrum disorders for children ages 10 and above per (National Standards Project, National Autism Center (2015)) and is not a covered benefit." Dkt. 15-6, at 2. PPFOF para. 48.

Similarly, under the same section, Policy 121 stated: "Occupational therapy, including sensory integration therapy is not an evidence-based treatment for the core deficits of autism spectrum disorders (Social-communication deficits and repetitive/stereotyped behaviors) ((National Standards Project, National Autism Center (2015)) and is not a covered benefit." *Id.* at 3. PPFOF para. 49.

GHC's April 25, 2019 denial of Plaintiffs' appeal letter stated as follows:

> "The decisions were based on the determination that speech and language evaluations and therapy are not evidence-based treatment for the core deficits of autism spectrum disorder for children ages ten and above according to the National Standards Project, National Autism Center (2015) and is not a covered benefit. The criteria used in this decision was GHC-SCW Medical Policy CM.121. Additionally, occupational therapy for the treatment of autism spectrum disorders is considered experimental and investigational because it is not an evidence-based treatment for autism. Please reference your 2018 HMO Member Certificate, Article VI: Exclusions and Limitations, Section A. Paragraph 12 on page 79. Group Health Cooperative of South Central Wisconsin provides a wide range of benefits and services. However, these benefits are not without limitation." PPFOF para. 50.

The Plaintiffs' subsequent request for external review was denied on September 19, 2019, where Maximus Federal Services stated that "the denial was based on a provision of your health plan contract; specifically regarding your benefit coverage and/or exclusions… and did not include medical judgment." PPFOF para. 51.

GHC subjected Plaintiff's claim for coverage to a very rigorous analysis. GHC claims the services for which K.H. sought coverage were non-intensive level services. PPFOF para. 52. Moreover, GHC claims the reason it denied the coverage claim for occupational therapy was that occupational therapy was not evidence based. PPFOF para. 52. GHC made the same explanation with respect to the request for coverage for speech therapy. PPFOF para. 53. GHC claims to have conducted a similar, rigorous analysis into whether speech therapy for children with autism was evidence based.

GHC's coverage criteria for speech therapy is inconsistent with generally accepted medical practices because it arbitrarily denies coverage for speech therapy when a child becomes ten years old. PPFOF para. 54. The association of the American Speech-Language pathologists, ASHA, conducted a comprehensive literature review of over 1,000 published studies from 1990-2011. PPFOF para. 55. The resulting publication, *Evidence-Based Practices for Children, Youth, and Young Adults with Autism Spectrum Disorder* (2014), focused on communication and social outcomes in young people with ASD, including youth up to the age of 22. PPFOF para. 56.

Among the practices that met the criteria for evidence-based speech therapy practices are:

- Social Skills Training: Specifically, "instruction designed to teach learners with autism spectrum disorders ways to appropriately interact with peers, adults and other individuals. Most social skills meetings include instruction on basic concepts… and feedback to help learners with ASD acquire and practice communication, play or social skills to promote positive interactions with peers." There are numerous studies that showed the clinical benefit of this intervention, including 7 group studies and 8 single case studies.

- Prompting: Verbal or gestural assistance given to patient to help them acquire or engage in a targeted behavior or skill.

- Social Narratives: Social narratives that describe social situations by highlighting relevant cues and offer examples of appropriate responses. PPFOF para. 57.

Evidence-based treatments for speech therapy and speech intervention continue beyond a child's tenth year. PPFOF para. 58. Progress reports submitted by Plaintiffs to GHC during the appeal process revealed that K.H. benefited from speech intervention therapy. PPFOF para. 59. They also show that she continued to need full speech therapy treatment to develop her functioning skills in social pragmatic language and remedy her core deficits in speech related to her autism diagnosis. PPFOF para. 60.

The evidence-based research that OT is effective for children and adolescents with ASD is well-documented. PPFOF para. 61. OT treatment and activities promote social interaction and problem-solving, and address specific skill acquisitions. PPFOF para. 62. In fact, the National Standards Project, Phase 2 (2015) ("NSP2") supports the OT interventions K.H. receives from her autism

providers. PPFOF para. 63. That publication includes guidance regarding intervention targets for treating people with ASD. PPFOF para. 64. Among the targets suggested are motor skills, self-regulation, and personal responsibility. PPFOF para. 65. These are the very targets that K.H. has been working on in her OT treatment, and she has been progressing and meeting her goals. PPFOF para. 66. According to the NSP2, targets used in treatment should increase developmentally appropriate skills. PPFOF para. 67. There is nothing in NSP2 that suggests its treatment is deemed "experimental" as insisted by GHC in Policy 121. PPFOF para. 68.

*Current Procedural Terminology Current CPT (CPT)* is a listing of descriptive terms and identifying codes for reporting medical and behavioral health services and procedures performed by physicians and other health care providers. PPFOF para. 69. The CPT codes are permanent medical codes that are used with the Centers for Medicare and Medicaid Services and all insurance payors throughout the country to identify and pay for services supplied to children with autism. PPFOF para. 69.

The CPT code is issued, copyrighted, and maintained by the American Medical Association. PPFOF para. 70. The inclusion of a description and its associated five-digit code number in the CPT Category 1 code set is based on the determination that the procedural service is consistent with contemporary medical practice and is performed by many practitioners in clinical practices and multiple locations. PPFOF para. 70. Both occupational therapy and speech therapy for

children with autism are Category 1 codes identified in the American Medical Association CPT codebook. PPFOF para. 70. As Category 1 procedures, both treatments meet the AMA clinical efficacy criteria and are documented in literature that meets requirements set forth in the CPT code application process.  PPFOF para. 70.

Speech therapy for children with autism is not limited by age under any Category 1 CPT code. PPFOF para. 71. Occupational therapy for children with autism is widely accepted and as a Category 1 code, meets all criteria for current medical practice and is documented in literature that meets the requirements set forth by the American Medical Association to establish the CPT code designation. PPFOF para. 71.

## ARGUMENT

I.     *The Court should not rule on this motion for summary judgment*
       *until the plaintiffs have conducted discovery.*

Plaintiffs have filed a motion under Rule 56(d) to conduct discovery before responding to the motion. Without discovery, Plaintiffs cannot adequately refute the claims made by GHC in its motion for summary judgment. Subject to this objection, Plaintiffs respond below.

II.    *GHC abused its discretion and abused its fiduciary duty to K.H.*
       *when it denied plaintiffs' requests for benefits.*

Section 1132(a)(1)(B) allows an ERISA plan participant to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the

16

terms of the plan[.]" Furthermore, under the plan's terms, GHC had "the discretionary authority to determine eligibility for Benefits and to construe the terms of [the] Certificate." Where a plan administrator has such discretionary authority, the court reviews the decision under the arbitrary and capricious standard. *See Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 321 (7th Cir. 2007) ("[B]ecause the Plan's administrator does have discretionary authority, the court reviews Williams's denial of benefits under the arbitrary and capricious standard."); *Hackett v. Xerox Corp. Long–Term Disab. Income*, 315 F.3d 771, 773 (7th Cir. 2003) ("Where the plan does grant discretionary authority to the administrator, the court reviews the decision under the arbitrary and capricious standard."). An administrator's review is tempered by skepticism when the plan administrator has a conflict of interest in deciding whether to grant or deny benefits. *Harlick v. Blue Shield of Cal.*, 686 F.3d 1105, 1110 (9th Cir. 1999). Such a conflict arises when the same entity makes the coverage decisions and pays for the benefits, as is true in this case. *Id.* Moreover, the arbitrary and capricious standard does not render benefit determinations unchallengeable in litigation: such a determination can usually only be made with the benefit of a full record. *Day v. Humana Ins. Co.*, 335 F.R.D. 181, 191. (N.D. Ill., 2020).

When a plan hires independent experts, it is evidence of a thorough investigation, but administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including opinions of a treating physician. *Day v. Humana Ins. Co.*, 335 F.R.D. 181, 191. (N.D. Ill., 2020). Considering evidence selectively in

making a benefits determination is arbitrary and capricious. *Id.*, at 193. *Vallone v. CAN Fin. Corp.*, 2000 U.S. Dist. LEXIS 6763 (N.D. Ill.), \*7-8 (discovery permitted beyond the claims file to be allowed to investigate whether an ERISA appeal was conducted in good faith).

The record is replete with evidence that GHC acted in an arbitrary and capricious manner when denied the benefits. For example, GHC claims that the NSP found that there was not sufficient evidence that supported speech therapy as an established treatment for children over ten years of age. Dkt. 18:28. The source to which GHC cites is a page from the NSP study that never uses the term "speech therapy." Dkt. 15-8: GHC 341. This omission is one example of GHC's arbitrary behavior.

Group Health Cooperative also claims that it received, reviewed and considered the reams of information K.H. presented to it, which consisted of scientific studies and reports specific to K.H. Dkt. 17-1: GHC 509-527, 531-619. This information did not simply provide another viewpoint with respect to whether the treatments K.H. sought were evidence-based. From a scientific point of view, it overwhelmed the evidence claiming that the treatment was not evidence based. How those expert in the field would have interpreted these records should be in the province of expert opinion. For now, however, it creates a material issue of fact.

Group Health Cooperative further claims that it spoke peer-to-peer in determining whether to deny the benefit coverage. DPFOF 60-61. But the document to which it refers simply states, "After this Peer to Peer the Medical Director's

decision is to uphold this denial." Dkt. 17-1: GHC 628. The lack of reasoning is evidence of arbitrary and capricious behavior. If GHC failed to plainly articulate its grounds for its decision or offered shifting or incomplete explanations, then plaintiffs would be able use that information gathered in discovery to argue that GHC's decision was arbitrary and capricious. *Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996), ("An administrator who fails to articulate his grounds runs the risk that a court will find that he has no grounds[.]").

Group Health Cooperative claims to have considered other information as well, including letters from K.H.'s providers showing that K.H. had made progress after receiving speech therapy, with citations to studies. Once again, GHC does not explain why this information was unpersuasive, but the information that led to its preferred (i.e., less costly) result was reliable. Even worse, GHC tries to legitimize its denial by claiming that it sought an "independent" review from MRIoA. DPFOF, Dkt. 14, ¶ 87-89. But there is absolutely no indication from the record that GHC provided the "independent" reviewer with K.H.'s medical records, letters from K.H.'s physicians stating that K.H. was making progress with the requested therapy, or the multiple medical studies submitted to support K.H.'s request for services, or that those records were considered.  Dkt. 15-12, p. 20.

After the 2018 denial, Group Health Cooperative acknowledges that K.H. sent even more information – well over a hundred pages of testimonials from K.H.'s providers and studies. As with all the other information provided by K.H., there is

no explanation of how this information was considered in conjunction with the information GHC claims to have relied.

Moreover, GHC states, "GHC reviewed the studies but ultimately decided to rely upon the National Standards Project (and its analysis of hundreds of studies) and MRIoA experts as opposed to the single studies submitted by Plaintiffs." Dkt. 18:29. GHC then cites to a proposed finding of fact that simply cites one page from one of the studies K.H. provided to GHC. Dkt. 15-10: GHC 602. GHC provides no explanation for why the information provided by K.H. was inferior to the information GHC purportedly relied upon. Evidently, it just arbitrarily decided to favor the studies that saved it more money, ignoring medical studies and statements from K.H.'s treaters that speech and occupational therapy were not only helpful and medically necessary, but that the therapies were specially helping K.H.

Group Health Cooperative further claims to have relied upon regular reviews of the literature. DPFOF 34.

In addition to what is set forth above, the extent to which GHC relied on "independent" sources also demands discovery. GHC makes much of its reliance on MRIoA sources, and refers the Court to a June 29, 2018, report. Dkt. 18:28. However, in opining that the effectiveness of speech therapy was unproven in children older than ten years, the MRIoA *cited to the NSP project*, which was the basis for the original opinion GHC was ostensibly seeking to verify. Dkt. 15-12: GHC 673. The report also contains no indication that that "independent" reviewer was sent or considered any information specific to K.H. such as the medical

literature submitted on her behalf or the letters from her providers documenting her progress with the requested therapies. *Id.* Once more, this is circumstantial evidence that GHC was merely going through the motions with respect to its coverage decision and not actually exercising discretion.[1]

A sub-issue that requires discovery is whether it was arbitrary and capricious for GHC to determine that nonintensive-level therapy would be outside of the Plan's coverage even if intensive-level therapy was. There is no dispute that K.H. received intensive-level services before she turned ten, and there is no dispute that those services were evidence-based per the language of the Plan.  Nonintensive-level services are defined as evidence-based therapy that occurs after the completion of treatment with intensive-level services and that is designed to sustain or maximize gains made during treatment with intensive-level services. Dkt. 15-11: GHC 646. There is no age limit under statute with respect to coverage for non-intensive level services. Dkt. 15-10: GHC 528, 15-11: GHC 649. There is absolutely nothing in the record that indicates GHC ever inquired about whether nonintensive-level therapy would be an evidence-based therapy *where a child received intensive-level therapy before age ten*. From all appearances, GHC simply lumped intensive and

---

[1] The April 22, 2019 report, although not relying on the NSP report, fares no better.  It cites to studies from 2010 and 2014. Dkt. 15-14: GHC 905. Once again, to determine if GHC's decision was reasonable, K.H. needs to conduct discovery to determine how, if at all, the age of the study in question impacted the coverage decision, especially in light of the evidence that K.H. had provided to GHC. Further, the April 22, 2019 report cites a 2017 study titled "Effectiveness of 1:1 speech and language therapy for older children with (developmental) language disorder", which appears to directly contradict the reviewer's conclusion.   That study concluded in part that "Direct 1:1 intervention with an SLT can be effective for all areas of language for older children with (D)LD, regardless of their gender, receptive language or ASD status, or age." The study also concluded that "direct SLT services should be available for school-aged children with (D)LD, including older children and adolescents with pervasive difficulties." See https://pubmed.ncbi.nlm.nih.gov/27859986/

nonintensive-level treatment together in its purported efforts to determine whether coverage was allowed. This, too, was arbitrary and capricious.

Finally, as GHC admits itself, the Plan excluded all services that GHC deemed to be "Experimental, Investigational or Unproven," which included treatments that were not a commonly accepted practice," lacked recognition and endorsement of nationally accepted medical panels, did not have the positive endorsement of supporting medical literature, or for which "reliable evidence" did not show that there was a consensus of opinion among experts of the efficacy of the treatment. Dkt. 35:11. The plan covered complementary medicine, including homeopathy, which means that GHC concluded that these medical treatments were not experimental, investigational or unproven, that it was a commonly accepted practice, that it was recognized and endorsed by nationally accepted medical panels, that it was supported by the literature and that reliable evidence showed that there was a consensus of opinion among experts of the efficacy of the treatment. Assuming this to be true, then an issue of fact exists with respect to its abuse of discretion when it reviewed the records provided by K.H.'s family and concluded that occupational and speech were not evidence based but instead were experimental, investigational or unproven.

GHC also failed to interpret plan properly. It should have considered K.H.'s occupational therapy request as a request for coverage of movement therapy. Its failure to cover the occupational therapy request as movement therapy was arbitrary.

GHC VIOLATED THE PARITY ACT.

   *I.*      *The Parity Act, Generally.*

The Parity Act is enforceable through a cause of action under 29 U.S.C. § 1132(a)(3). *See Christine S. v. Blue Cross Blue Shield of New Mexico*, 428 F. Supp. 3d 1209, 1219-20 (D. Utah 2019) (plaintiffs could enforce their Parity Act rights only through § 502(a)(3) or ERISA, not § 502(a)(1)(B)); *Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1259 n.118 (D. Utah 2016) (finding Parity Act enforceable through a cause of action under 29 U.S.C. § 1132(a)(3)); *accord Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996) (describing Section 502(a)(3) as a "catchall...[that] offer[s] appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy.").

Under the statute, ERISA plans that choose to offer mental health coverage must ensure that:

> the treatment limitations applicable to ... mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan ... and there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits.

29 U.S.C. § 1185a(a)(3)(A)(ii). "Put simply, the Parity Act prohibits the imposition of more stringent treatment limitations for mental health treatment than for medical treatment." *Bushell v. UnitedHealth Grp. Inc.*, No. 17-CV-2021 (JPO), 2018 WL 1578167, at *4 (S.D.N.Y. Mar. 27, 2018).

The Parity Act defines "treatment limitations" as including "limits on the

frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment."[2] *Id*. Regulations promulgated by the Departments of Labor, Health and Human Services, and Treasury clarify that treatment limitations should be scrutinized with respect to certain classifications of treatment: (1) inpatient, in-network; (2) inpatient, out-of-network; (3) outpatient, in-network; (4) outpatient, out-of-network; (5) emergency care; and (6) prescription drugs. 29 C.F.R. § 2590.712(c)(2)(ii). If a plan provides medical benefits within a certain classification, it cannot impose more stringent limitations on a mental health benefit within the same classification.

Additionally, the Parity Act regulations explain that the Act also applies to "nonquantitative" treatment limitations (NQTLs), which are limitations that are not expressed numerically, but "otherwise limit the scope or duration of benefits for treatment." 29 C.F.R. § 2590.712(a). Examples of NQTLs include limitations on geographic location, facility type, drug formulary design, provider network admission, step therapies, and other similar medical management program design elements. 29 C.F.R. § 2590.712(c)(4)(ii). With respect to NQTLs, the implementing regulations mandate that "any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health . . . benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other facts used in applying the limitation with respect to medical/surgical benefits in the

---

[2] These types of treatment limitations are called "quantitative treatment limitations" as they are numerically based.

same classification." 29 C.F.R. § 2590.712(c)(4)(i).  In other words, "[p]lans need not apply the *same* limitations to all benefits; rather, 'the processes, strategies, evidentiary standards, and other factors plans use[ ] to impose those limitations [have] to be *comparable* for all benefits.'" *Alice F. v. Health Care Serv. Corp.*, 367 F. Supp. 3d 817, 827–28 (N.D. Ill. 2019) (emphasis in original) (internal quotation and citation omitted).

As district courts in this circuit and elsewhere have observed, "'there is no clear law on how to state a claim for a Parity Act violation,' and as a result, 'district courts have continued to apply their own pleading standards.'" *Smith v. Golden Rule Ins. Co.*, 526 F. Supp. 3d 374, 386 (S.D. Ind. 2021) (quoting *Michael W. v. United Behav. Health*, 420 F. Supp. 3d 1207, 1234 (D. Utah 2019)); *see also Rula A.-S. v. Aurora Health Care,* No. 20-cv-1816-JPS, 2021 WL 3116143, at *3 (E.D. Wis. July 22, 2021) (observing same).  Although these various pleading standards differ somewhat, courts generally agree that a plaintiff bringing a Federal Parity Act claim is not restricted to showing that the plan *expressly* discriminates against mental health or substance abuse treatment (*i.e.* a facial claim), but may also challenge a coverage provision "as applied," that is, by showing that a facially neutral coverage term is applied disparately in practice. *Smith*, 526 F. Supp. 3d at 389 ("Mr. Smith need not identify a treatment limitation expressly outlined in the Policy that applies to mental health or substance abuse treatment but not to medical or surgical treatment; it is enough for him to allege that the facially neutral medical necessity requirement is applied disparately in practice."); *Rula*

*A.-S.*, 2021 WL 3116143, at \*4 (agreeing with *Smith*); *Michael W.*, 420 F. Supp. 3d at 1238 ("Plaintiffs have plausibly pleaded that, for outdoor behavior treatment programs, which in practice are only available to those seeking mental health/substance abuse care, Defendants' policy of excluding outdoor behavior therapy from coverage is because of more restrictive criteria that is not applied to analogous medical/surgical care.").  In the end,

> [t]he ultimate question in any Parity Act case is whether the plaintiff has plausibly alleged that his health insurance plan applies a separate or more restrictive treatment limitation to mental health and substance abuse services versus medical and surgical services, and the different standards merely provide a framework for considering that question as it relates to the different types of Parity violations, including facially disparate treatment, categorical exclusions, and as-applied challenges.

*Smith*, 526 F. Supp. 3d at 388–89.

To establish a violation of the Parity Act, a plaintiff must show 1) that the relevant plan is subject to the Parity Act; 2) that the plan provides both medical/surgical benefits and mental health benefits; 3) the plan includes a treatment limitation for mental health benefits that is separately applied only to mental health or more restrictive than medical/surgical benefits (either on its face or in practice); and 4) the mental health being limited is in the same classification as the medical/surgical benefit to which it is being compared. *M.S. v. Premera Blue Cross*, 2021 U.S. Dist. LEXIS 151055, \*46 (D. Utah), *Doe v. United Behavioral Health*, 523 F.Supp.3d 1119, 1128 (N.D. Cal. 2021), *A.Z. by & through E.Z. v. Regence Blueshield*, 333 F. Supp. 3d 1069, 1082 (W.D. Wash.

2018).

II.   *Plaintiffs' Amended Complaint States a Parity Act Claim.*

It is not clear what standard Defendant would have the Court apply to its request to dismiss County III. On one hand, Defendant argues that "Plaintiffs' Amended Complaint still fails to allege either a facial or as-applied violation." ECF No. 35, P. 39. On the other hand, Defendant's motion is styled as a motion for summary judgment, and it attached multiple documents that go far beyond the pleadings. Either way, the motion should be denied. Plaintiffs' Amended Complaint clearly states a claim, and it would be inappropriate to grant summary judgment to Defendant without giving Plaintiff the opportunity to engage in discovery. Regardless, with the facts available to Plaintiffs, they make their best attempt to respond.

1.   *The Amended Complaint states a facial Parity Act violation.*

The Plan contains facial violations of the Parity Act, and Plaintiffs appropriately alleged as much. For example, Plaintiffs alleged that GHC's exclusion of "experimental" treatment is more restrictive for mental health coverage than for medical coverage in the same treatment classification. ECF No. 32, ¶ 96.  Likewise, Plaintiffs alleged that GHC's policies concerning coverage of "evidence-based treatments" are more restrictive for mental health coverage than for medical/surgical services in the same treatment category. *Id*, ¶ 98.

Defendant's motion asserts that Plaintiffs are "misguided" by using Defendant's treatment of chiropractic services as an example of Defendant covering

non-evidence based medical/surgical benefits while excluding non-evidence-based mental health treatments.  ECF No. 35, Page 43.  Defendant then goes far beyond the pleadings or the plan, citing policies that have never been produced nor subject to discovery (e.g. Policy 117 relating to chiropractic care).  Defendant then asserts that its determination of which chiropractic services are evidence-based is based upon its review of research, which is the same process it uses to determine whether ASD services are evidence-based.  *Id* at 44.  However, none of these attempts to explain the reasons why the plan has different standards have been subject to discovery, and the investigation conducted by Plaintiffs' counsel showed serious doubt that this treatment is evidence based.  It is best resolved by expert testimony after discovery is taken. But on its face, the fact that the plan has different standards for mental health benefits means that there is a facial violation of the Parity Act.

### 2. *An issue of fact exists with respect to whether GHC violated the Parity Act as-applied.*

Plaintiffs have more than sufficiently alleged that Defendant's plan applied allegedly facially neutral coverage terms disparately in practice.  ECF No. 32, ¶¶ 102-112.

For example, Plaintiffs alleged that K.H. was subjected to a more restrictive standard in order to prove that treatment for her autism was "evidence based" than individuals without autism for treatment of medical/surgical benefits within the same classification.  ECF No. 32, ¶ 103. Plaintiff cited that Defendant applies the "evidence-based" standard differently to chiropractic services than to occupational

and speech therapy for children with autism as an example of such disparate treatment. *Id*, ¶ 110.

Defendant's motion does not argue Plaintiff's Amended Complaint fails to state a claim. Instead, Defendant's motion points to other policies (like Policy 117) and claims that Plaintiff's allegations are false. Whether the allegations are true or not is question of fact that is inappropriate for the Court to resolve, especially at this juncture where there has been no discovery. Defendant also cites its "special review process for chiropractic claims," and argues that it has an "age-based treatment limitation" associated with the policy that is akin to the age-based restriction in the ASD policy.

Even if Defendant's claims were true with respect to the chiropractic policy, it would not entitle Defendant to summary judgment because Plaintiff's allegations are not limited to comparing and contrasting ASD treatment with chiropractic services. Plaintiff simply cited chiropractic care as support for its broader allegation that "GHC imposed a treatment limitation more stringently…for speech and occupational therapy for children with autism over the age of ten years than it did for comparable medical / surgical benefits. The facial, ostensibly neutral "evidence based" "experimental" and habilitation standards were applied disparately to K.H.'s claim for benefits." See ECF No. 32, ¶ 102; ¶ 106 – 107 ("Upon information and belief, other policies applicable to comparable services for medical and surgical benefits are less restrictive than the terms of Policy 121….

Furthermore, the standards set forth in the policies pertaining to comparable services are not *applied* as restrictively as those in Policy 121.")[3]

Chiropractic care is only one example. GHC held K.H.'s claim for coverage to greater scrutiny than it holds acupuncture, homeopathy, naturopathy, "energy work," "various types of eastern practices," movement therapy, wellness classes and lifestyle change classes.

Chiropractic care is only one example. GHC held K.H.'s claim for coverage to greater scrutiny than it holds acupuncture, homeopathy, naturopathy, "energy work," "various types of eastern practices," movement therapy, wellness classes and lifestyle change classes.

The case to be made that acupuncture, homeopathy, naturopathy, "energy work," and the undefined "various types of eastern practices" are "evidence based" is weak at best. The literature is nearly unanimous with respect to the lack of scientific proof that any of these in-network outpatient therapies have any medical benefits, with homeopathy leading the way.   Defendant's claim that these treatments are subjected to the same standard as therapy to treat autism and that the result is to approve these non-traditional medical therapies but deny therapy for autism is suspect at best, and implies Defendant is applying the standard in a disparate manner.  At a minimum, there is an issue of fact with respect to whether GHC held the treatments sought by K.H. to a higher evidentiary standard than

---

[3] Plaintiffs have also plausibly alleged that the "medically necessary standard was applied in a more restrictive fashion to benefits for children with autism than the standard applied to medical or surgical benefits."  *Id*, ¶ 108. Plaintiffs cited to the fact that Defendant applies

those applied to acupuncture, homeopathy, naturopathy, energy work, and various types of eastern practices.

THE PLAINTIFFS HAVE STATED A CLAIM UNDER STATE LAW.

If the Court determines that there is an issue of fact over whether the treatments K.H. sought were evidence based, then she has stated a claim under sec. 632.895(12m), Stats. Accordingly, the only issue for the Court to decide is whether the statute creates a private right of action.

A determination of whether a statute creates a private right of action is dependent on whether there is a clear indication of the legislature's intent to create such a right. *Grube v. John L. Daun*, 210 Wis.2d 681, 689, 563 N.W.2d 523 (1997). A private right of action is created when 1) the language or the form of the statute evinces the legislature's intent to create a private right of action, and 2) the statute establishes private civil liability rather than merely providing for protection of the public. *Id.*

In *Grube*, the Court concluded that the statute included clear provisions for state action when it ruled that the statute did not create a private right of action. *Grube,* 210 Wis.2d at 691. The statute as issue in this case rules the Insurance Commissioner can promulgate, but it is silent with respect to actual enforcement. sec. 632.895(12m)(f), Stats. Accordingly, the Court should rule that a private right of action exists, and that there is an issue of fact with respect to whether GHC violated the act.

Dated this 25th day of July, 2022.

**GINGRAS THOMSEN & WACHS LLP**
Attorneys for Plaintiffs


*s/ Paul A. Kinne*
Paul A. Kinne
State Bar Number:  1021493

8150 Excelsior Drive
Madison, WI  53717
Phone:  (608) 833-2632
Fax:  (608) 833-2874
Email: kinne@gtwlawyers.com