IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ANGELA MIDTHUN-HENSEN and TONY HENSEN,
  as representatives of their minor Daughter, K.H., and
  on behalf of all others similarly situated,

                              Plaintiffs,
    v.

GROUP HEALTH COOPERATIVE OF SOUTH
CENTRAL WISCONSIN, INC.,

                          Defendant.

OPINION AND
ORDER

21-cv-608-slc

---

In this putative class action for monetary and equitable relief, plaintiffs Angela Midthun-Hensen and Tony Hensen, as representatives of their minor daughter, K.H., allege that from 2017-2019, their health insurance provider, Group Health Cooperative of South Central Wisconsin, Inc. ("GHC"), unreasonably and unlawfully denied coverage for speech and occupational therapy as treatment for K.H.'s Autism Spectrum Disorder ("ASD"). Plaintiffs assert four causes of action: (1) to recover benefits due under GHC's health plan, pursuant to 29 U.S.C. § 1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"), as enforced through 29 U.S.C. § 1132(a)(1)(B); (2) breach of fiduciary duty under 28 U.S.C. § 1132(a)(3); (3) GHC violated the Mental Health Parity and Addiction Equity Act of 2008 ("Parity Act")[1] by failing to provide the sought-after treatment; and (4) GHC violated Wis. Stat. § 632.895, which mandates health insurers to provide certain coverage to treat ASD.

The case is before the court for the third time on GHC's motion for summary judgment, after the court twice denied plaintiffs' requests to stay the motion and conduct discovery under Rule 56(d). *See* dkts. 31, 59. As distilled by this court's two previous orders and the parties'

---

[1] an ERISA amendment codified at 29 U.S.C. § 1185a(a).

briefs, two disputes remain to be decided: (1) whether GHC abused its discretion in determining that the treatments sought by plaintiffs were not evidence-based; and (2) whether GHC applied a more stringent test for evaluating the medical support for ASD treatments, a mental health condition, than chiropractic treatments, a medical condition. As discussed in more detail below, I conclude that GHC fairly considered plaintiffs' claims and came to the rational conclusion that the treatments they were requesting were not covered by the policy because they were not evidence-based. I further conclude that plaintiffs have failed to show that GHC violated the Parity Act or Wisconsin's autism mandate. Accordingly, I will grant GHC's motion for summary judgment.

Before setting out the facts, some preliminary observations about plaintiffs' proposed findings are in order. First, I have disregarded plaintiffs' proposed facts, as well as any argument, concerning GHC's coverage for complementary medicine. *See* dkt. 49, PPFOF 31-33; 40-43. As I noted in the September 27, 2022, order, any alleged Parity Act violation based on GHC's coverage for complementary medicine is beyond the scope of the amended complaint and will not be considered. Dkt. 59, at 7. Second, many of plaintiffs' proposed findings of fact and responses to defendants' proposed findings are not properly supported by citations to admissible evidence in the record. For example, many of plaintiffs' proposed findings improperly cite to a this court's May 6, 2022 opinion and order, which the court explicitly stated did not "reflect findings of fact by the court." *See* Plts.' PFOF, dkt. 49, at ¶¶ 22-30. Plaintiffs' responses to defendant's proposed facts also cite routinely to the administrative record or to lengthy documents attached to an affidavit from their counsel, without citing to a specific page number. *See, e.g.* Responses to Def.'s PFOF, dkt. 50, at ¶¶ 11, 31, 34-38, 40-44, 56, 104, 107. In doing

so, plaintiffs violate this court's rules regarding proposed findings of fact, which specify that "[e]ach factual proposition must be followed by a reference to evidence supporting the proposed fact" and must "make it clear where in the record the evidence is located." Prel. Pretrial Conf. Packet, page 5. *See also id*. at p. 6 (specifying what constitutes admissible evidence and providing that "[t]he court will not search the record for evidence."). In accordance with those rules, I have disregarded any proposed facts that are not properly supported with specific citations to admissible evidence in the record.

Against this backdrop, I find that the following facts—most of which are drawn from the administrative record— are not in dispute:

## UNDISPUTED FACTS

### I. Terms of Plaintiffs' Health Plan

GHC is a non-profit, health maintenance organization that offers health insurance and oversees the administration of benefits provided under those health insurance plans. Plaintiff Angela Midthun-Hensen enrolled herself, her husband (plaintiff Tony Hensen) and their daughter (K.H.) in an employer-sponsored health plan issued and overseen by GHC. K.H. has been diagnosed with Autism Spectrum Disorder ("ASD"). This case concerns GHC's denial of coverage, from 2017-2019, for two kinds of treatments that the Midthun-Hensens sought for K.H.'s ASD: (1) speech therapy and (2) a specific type of occupational therapy called "sensory integration" or "sensory intervention" therapy.

GHC provides its members with a plan Member Certificate that explains the terms, benefits, limitations and conditions of the group health plan.[2]  Article III of the Member Certificate for plaintiffs' plan specifies that GHC had "the discretionary authority to determine eligibility for Benefits and to construe the terms of [the] Certificate" and that any such determination or construction would be final and binding on the parties unless arbitrary and capricious.  Under the certificates, GHC also "reserve[d] the right to adopt and interpret policies, procedures and rules applicable to all services being provided" to members pursuant to the certificates.

## II.  The Plan's Coverage for the Benefits Sought by Plaintiffs

The Member Certificates for the years at issue contain a number of provisions relevant to the speech and occupational therapy benefits sought by plaintiffs.

First, the certificates provided that all services that were not "medically necessary" were excluded by the plan.  To be "medically necessary," a treatment had to be deemed, among other things, to be "appropriate under the standards of acceptable medical practice" to treat the member's illness, disease or injury.  The 2018 plan further provided that GHC, through its Medical Director, was authorized to make the determination whether a treatment was medically necessary and eligible for coverage under the plan, using criteria developed by recognized sources.

---

[2] This case involves three Member Certificates which were effective on July 1 of each year. The 2016 Member Certificate was in place during plaintiffs' pre-service coverage requests and appeals in 2017; the 2017 Member Certificate was in place during plaintiffs' pre-service coverage requests and appeals in 2018; and the 2018 Member Certificate was in place during plaintiffs' pre-service coverage requests and appeals in 2019.

Second, the Member Certificates provided that GHC's plan excluded services that were

"Experimental, Investigational, or Unproven." Those terms were defined, in part, as follows:

> [A] health service, treatment, or supply used for an illness or injury which, at the time it is used, meets one or more of the following criteria:
> . . .
>> b.  is not a commonly accepted medical practice in the American medical community;
>> . . .
>> h.  lacks recognition and endorsement of nationally accepted medical panels;
>>
>> i.  does not have the positive endorsement of supporting medical literature published in an established, peer reviewed scientific journal;
>> . . .
>> m.  reliable evidence shows that the consensus of opinion among experts regarding the treatment, procedure, device, drug or medicine is that further studies or clinical treatments are necessary to determine its . . . efficacy or efficacy as compared with standard means of treatment or diagnosis.  "Reliable evidence" shall include anything determined as such by GHC-SCW, within the exercise of its discretion, and may include published reports and articles in the medical and scientific literature generally considered to be authoritative by the national medical professional community, the written protocol(s) used by the treatment facility or the protocol(s) of another facility studying substantially the same treatment, procedure, device, drug or medicine; or the written informed consent used by the treatment facility or by another facility studying substantially the same treatment, procedure, device, drug or medicine . . .

All coverage otherwise provided by the plan—whether that coverage provided mental

health benefits or medical/surgical benefits—was subject to exclusion if GHC determined that

it was not "medically necessary" or that it was "experimental, investigational or unproven."

5

Third, GHC's plan provided some coverage for both "intensive level" and "non-intensive level" treatment of Autism Spectrum Disorder ("ASD").[3]  Under either level, the plan specified that the treatment had to be "evidence based."[4]

Finally, plaintiffs' health plan did *not* provide coverage for outpatient habilitation therapies.[5]  The 2017 and 2018 Member Certificates defined "Outpatient Habilitation Therapies" as:

> Medically Necessary health care services that assist an individual in partially or fully acquiring or improving skills and functioning for daily living and that are necessary to address a health condition to the extent possible for daily living.  Examples include therapy for a child who is not walking or talking at the expected age.

The Member Certificates provided some coverage for outpatient *rehabilitation* therapies. However, they excluded outpatient rehabilitation therapies, including physical therapy, speech therapy, occupational therapy, and hearing treatments, when diagnosed for and used for the treatment of chronic brain injuries, including development delay, intellectual disability, and cerebral palsy.  Sensory integration therapy (a type of occupational therapy used to treat autism) was expressly excluded as a treatment for any condition.  In addition, GHC specifically excluded "sensory integration therapy" from coverage under its exclusions for ASD Services.

---

[3] Plaintiffs admit that the coverage at issue in this lawsuit was for *non-intensive* level services and that K.H. had already exhausted her benefits for intensive level services. Dkt. 50, Response to DPFOF, ¶51.

[4] In its briefs, GHC uses the terms "evidence-based," "non-experimental," and "medically necessary" interchangeably, with no objection from plaintiffs.

[5] GHC issues some plans that cover habilitation therapies, but Midthun-Hensen's employer did not purchase that coverage for its members during the relevant 2017-2019 time frame.

### III.  Policy 121

To aid GHC in evaluating whether ASD treatments were evidence-based, not experimental or investigational, and accepted by the medical community (and therefore, medically necessary), GHC prepared a document referred to as Policy 121. Policy 121 did not add additional or different coverage terms to the Plan, but summarized and consolidated the status of research into medical treatments for ASD and the degree to which those treatments had been deemed effective by the medical community at large. Policy 121 set forth those treatments for ASD that GHC determined had sufficient evidence to support their efficacy, as well as those treatments that lacked such evidence.

In 2017-2019, when plaintiffs made their pre-service requests for treatments, Policy 121 relied upon a 2015 report referred to as the "National Standards Project" ("NSP"). The NSP had been issued by the National Autism Center as the second phase of the Center's review of the medical literature on ASD treatments.[6]  The NSP reviewed reliable peer-reviewed studies, published between 2007 and February 2012, on treatments for individuals with ASD and categorized the treatments as either (1) "established", *i.e.* supported by enough evidence to determine that it was effective; (2)  "emerging", *i.e.* additional studies were needed before the treatment could be deemed effective; or (3) "unestablished," *i.e.* having little or no evidence permitting a firm conclusion about effectiveness.

---

[6] See https://nationalautismcenter.org/national-standards/phase-2-2015/

With regard to speech therapy, the 2015 NSP provided that "Language Training (Production)" was an established treatment only for children aged 3-9.[7]  For individuals outside that range, the NSP categorized language training treatment as "emerging."  With respect to SI occupational therapy, the NSP found little to no evidence in support of its effectiveness for persons of any age, and thus classified it as "unestablished."

In 2017-19, GHC's Policy 121 adopted the NSP's determination that speech therapy was an evidence-based treatment for children aged 3-9 but not for children 10 and older. It also adopted the NSP's determination that there was insufficient evidence of the effectiveness of SI occupational therapy in treating ASD.

In 2020, the National Clearinghouse on Autism Evidence & Practice issued a report titled "Evidence-Based Practices for Children, Youth, and Young Adults with Autism" ("EBP Report"). Like the NSP before it, the EBP Report conducted a comprehensive review of the research literature on treatment interventions for children with ASD and identified those that were evidence-based practices.  Based on new studies, including those published after 2015, the National Clearinghouse concluded that both SI occupational therapy and certain speech and language treatments were evidence-based practices for the treatment of autism in children over the age of 10.  As a result of the 2020 EBP Report, GHC revised Policy 121 effective October 20, 2020 to reflect that speech therapy for children over age 10 and SI occupational therapy were evidence-based treatments for ASD.  Dkt. 37-7.

---

[7] As plaintiffs note and GHC agrees, the National Standards Project does not expressly refer to "speech therapy" but refers to "Language Training (Production)" treatment, which it found was an evidence-based treatment for children between the ages of 3-9.  Plaintiffs have not disputed GHC's assertion that it broadly considered "Language Training (Production)" to be a type of or equivalent to speech therapy.

Beginning in October 2020, GHC began approving claims for such treatments, including claims submitted by plaintiffs in August 2021.

## IV. Plaintiffs' Requests for Benefits

From July 2016 until March 2018 (before K.H. turned 10), GHC had authorized coverage for certain ASD treatments for K.H., including speech therapy. But once K.H. turned 10, GHC denied coverage for speech therapy. GHC also denied plaintiffs' requests for sensory integration occupational therapy. At issue in this case are GHC's denials of seven requests for either speech or occupational therapy from 2017-2019.

### A. 2017 Appeal of Denials of Requests for Occupational Therapy

On April 24, 2017, plaintiffs submitted a pre-service request for coverage of occupational therapy for K.H. to treat her ASD. GHC spoke to the provider, Communication Innovations, Inc., a pediatric therapy center offering speech, occupational, physical, and other therapies to children. GHC denied the claim by letter dated May 8, 2017, citing to Policy 121 and stating that "occupational therapy is not an evidence-based treatment for autism and is not covered."

Shortly thereafter, plaintiffs asked Communication Innovations to submit a new pre-service request but to change the diagnosis to indicate that occupational therapy was needed to address K.H.'s "low muscle tone and delays in both fine and gross motor skills." GHC again reviewed the claim and again denied it, finding that coverage for occupational therapy for this secondary diagnosis was not available under plaintiffs' plan. Specifically, GHC found it was not a covered benefit because it was outpatient occupational therapy for developmental delay and

for chronic conditions present in infancy or childhood, which was specifically excluded under the plan. GHC advised plaintiffs of the denial by letter of May 26, 2017, and stated that plaintiffs had a right to ask their provider to have a peer-to-peer conversation with a GHC physician reviewer.

Plaintiffs invoked their right to a peer-to-peer conversation. A GHC physician spoke to Communication Innovations on June 8, 2017. In a letter dated June 9, 2017, GHC notified plaintiffs that it was upholding its denial.

Plaintiff then appealed both the May 8 and June 9 denials. With their appeal, plaintiffs submitted a "letter of medical necessity" and an occupational therapy evaluation of K.H. from Communication Innovations. In addition, they submitted studies that they argued provided evidence in support of the treatment. However, one of the studies recognized that the evidence relating to the effectiveness of SI occupational therapy was "inconclusive" and remained "weak and require[d] further study." *See* dkt. 37-10, GHC_602.

GHC's Member Appeals Committee met on October 10, 2017 to review plaintiffs' request for occupational therapy. The committee was composed of two family medicine practitioners, neither of whom was employed by GHC, and two GHC employees knowledgeable about the plan's benefits – the Insurance Operations Manger and the Chief Insurance Services Officer. In a letter dated October 12, 2017, GHC advised plaintiffs that the committee decided to uphold the denial decision. GHC stated that the decision was "based on the determination that occupational therapy, including sensory integration therapy is not an evidence-based treatment for the core deficits of autism spectrum disorders as per the National Standards Project, National Autism Center (2015)." *Id*. at GHC_640.

**B.  2018 Appeals of Denial of Requests for Speech Therapy**

As K.H. was turning 10, GHC sent plaintiffs two letters advising that K.H. would not be covered for speech therapy after her tenth birthday.  First, on March 7, 2018, GHC sent plaintiffs a letter stating that their request for speech therapy at Communication Innovations had been denied on the ground that "[s]peech and language evaluations and therapy is not an evidence-based treatment for the core deficits of autism spectrum disorders for children ages 10 and above per (National Standards Project, National Autism Center (2015)) and is not a covered benefit." Dkt. 37-12, at GHC_660.  Second, on March 12, 2018, GHC sent plaintiffs a letter explaining that, absent coverage under the plan's provision for evidence-based ASD services, the plan did not otherwise cover outpatient habilitative speech therapy or outpatient rehabilitative speech therapy as a treatment for developmental delays. Dkt. 37-13, at GHC_688. On or about April 1, 2018, plaintiffs filed an appeal, specifically referencing the pre-service request that had been denied in the March 12, 2018 letter.  In their appeal, plaintiffs stated that they had spoken to GHC representatives and had understood from that conversation that speech therapy was covered.  Plaintiffs did not submit any additional medical records or scientific studies with their appeal.

GHC's Appeals Committee met on April 24, 2018 and upheld the denial, relying upon the same exclusions for "Outpatient Habilitation" and "Outpatient Rehabilitation" services that were referenced in the March 12, 2018 letter.

In June 2018, plaintiffs submitted a new pre-service request for speech therapy benefits to be provided by the University of Wisconsin Speech Therapy Department.  GHC denied the request, for three reasons:  (1) the plan limited ASD coverage to those treatments that were

evidence-based; (2) the plan excluded coverage for outpatient habilitation services and outpatient rehabilitation services for treating developmental delays; and (3) the plan excluded experimental and investigational treatments. Plaintiffs appealed that denial on approximately June 21, 2018. Plaintiffs attached letters from two of K.H.'s providers discussing her progress and argued that there was evidence in K.H.'s specific case that she was benefitting from speech therapy. Dkt. 39-3, GHC_658, 662-63.

In response, GHC sought an external review from the Medical Review Institute of America, LLC (MRIoA), asking whether speech therapy was an evidence-based approach for treating the core deficits of autism in children 10 years of age and older. *Id*. at GHC_673. GHC's request was reviewed by Dr. William Holmes, a physician board-certified in psychiatry and child and adolescent psychiatry, who has experience with autism and its therapies. Dr. Holmes answered GHC's question in the negative, stating that the use of speech therapy in older children did not have the same support in the medical literature compared to younger children. *Id*. As support, Dr. Holmes cited the National Standards Project, as well as another publication. *Id*.

On July 10, 2018, GHC's Appeals Committee met to decide plaintiffs' appeal. By letter dated July 12, 2018, the committee informed plaintiffs that it had decided to uphold the denial, explaining that plaintiffs were seeking habilitation speech therapy for a speech/language developmental delay, which was excluded from coverage under the Member Certificate. *Id*. at GHC_679. The denial letter did not refer to Dr. Holmes' review.

### C. 2019 Appeals of Denial of Requests for Speech and Occupational Therapy

In December 2018 and January 2019, plaintiffs submitted new pre-service requests for occupational therapy and speech therapy for treatment of K.H.'s ASD. GHC denied these requests on the ground that the treatments were not evidence-based and were experimental and investigational treatments excluded from coverage under the plan. Dkt. 39-5, GHC_715. Plaintiffs appealed both denials on or about April 10, 2019. With their appeal, plaintiffs submitted evaluations of K.H. by her providers, along with studies that they argued showed the effectiveness of speech and occupational therapies for children with ASD. *Id*. at GHC_725-863.

In response, GHC again sought an independent, non-binding external review from MRIoA, providing it with the assessments, notes, and articles it had received from plaintiffs as part of their appeals. The review was performed by Dr. Paul Hartman, a specialist in child and adolescent psychiatry with experience treating patients with ASD. In response to questions from GHC, Dr. Hartman stated that there was no additional data that had come forth since June 2018 to demonstrate that speech therapy was an effective treatment option for ASD in children over age 10. Also, occupational therapy was not an evidence-based treatment for ASD, noted Hartman, explaining "[t]he research on occupational therapy practices in autism is sparse and considered methodologically flawed[.]" Dkt. 39-5, at GHC_ 905.

On April 23, 2019, GHC's Appeals Committee met to decide plaintiffs' appeal. Plaintiffs Angela Midthun-Hensen and Tony Hensen attended the meeting. After the meeting, the appeals committee voted to affirm the denial. It informed plaintiffs of its decision by letter dated April 25, 2019. *Id*. at GHC_911. Citing Policy 121, GHC stated that speech and language evaluations and therapy were not evidence-based treatment for the core deficits of autism spectrum disorder

13

for children ages 10 and above according to the National Standards Project. *Id*. And it found "occupational therapy for the treatment of autism spectrum disorders is considered experimental and investigational because it is not an evidence based treatment for autism," referring to the policy's exclusion for experimental or investigational services. *Id*.

## V. Plan Coverage for Chiropractic Services

The Member Certificates provided that the following chiropractic services were covered by the plan:

> Medically Necessary Chiropractic Services when provided by a chiropractor designated by GHC-SCW.  Chiropractic Services are Medically Necessary when all of the criteria are met:
>
> 1.  The Member has a neuromusculoskeletal disorder; and
>
> 2.  The Medical Necessity for the treatment is clearly documented; and
>
> 3.  Improvement is documented within the initial two (2) weeks of chiropractic care
>
> Maintenance therapy and maintenance care related to Chiropractic Services is not covered.

To aid GHC in evaluating whether chiropractic treatments were evidence based, not experimental/investigational, and accepted by the medical community, GHC prepared a document referred to as Policy 117.  The clinical guidance provided in Policy 117 was based upon GHC's review of research briefs and the research contained in the coverage guidelines for other major medical insurers.

GHC has submitted the current version of Policy 117, which was last revised in November 2021. Dkt. 37-15.  It provides that GHC considers chiropractic treatments to be

14

medically necessary (and not experimental or investigational) when the following criteria are met:

> a.    The member has a neuromusculoskeletal condition that is documented and substantiated by history, subjective symptoms, supportive clinical examination, and correlating assessment(s)/diagnosis.
>
> b.    The rationale for chiropractic treatment is clearly defined and includes a specific treatment plan and anticipated outcome.
>
> c.    Subjective and/or objective improvement is clearly documented within the initial 2 weeks of chiropractic care.
>
> d.    Chiropractic treatment directed at pediatric patients (less than 18 years of age) is considered medically necessary when the treatment is directed at a clearly defined neuromusculoskeletal condition for which spinal manipulation therapy is an appropriate intervention.

> *Id*.

Policy 117 further provides that all claims for chiropractic treatment for children under age 9 should be procedurally denied with a request to submit medical documentation.

Finally, Policy 117 lists the sources on which GHC relied in preparing the policy.[8]  Four of those sources are policies from four major health insurers:  Aetna, Cigna, United Health Care, and Humana.  The fifth and sixth are documents from Hayes and MCG Health, companies that

---

[8] In its supplemental response to the summary judgment motion, plaintiffs asserted that they were able to access only three of the cited sources. In its reply, GHC offered to provide copies to plaintiffs on request, acknowledging that some of the resources required subscriptions.  Dkt. 67, at ¶3. I surmise from plaintiffs' failure to update their submissions that plaintiffs either did not take GHC up on its offer or the additional sources did not advance their claim.

develop evidence-based care guidelines for the health care industry based on their review of clinical evidence.[9]

## OPINION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit."  *Anderson*, 477 U.S. at 248.  A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In deciding a motion for summary judgment, the court views the facts in the light most favorable to the non-moving parties.  *Crull v. Sunderman*, 384 F.3d 453, 460 (7th Cir. 2004).

As noted previously, plaintiffs' amended complaint asserts four causes of action:  (1) to recover benefits due under GHC's health plan under 29 U.S.C. § 1132(a)(1)(B); (2) breach of fiduciary duty under 29 U.S.C. § 1132(a)(3); (3) GHC violated the Parity Act by failing to provide the sought-after treatment; and (4) GHC violated Wis. Stat. § 632.895.  GHC has moved for summary judgment on the entire complaint.  Plaintiffs have not opposed GHC's request for summary judgment on Count II or on plaintiffs' requests for declaratory judgment and future benefits, so that cause of action and those claims for relief will be dismissed without

---

[9] https://evidence.hayesinc.com/static/AboutHayes, https://www.mcg.com/about/company-overview

further discussion.  Plaintiffs' remaining claims will also be dismissed, for the reasons stated below.

## I.  Count 1:  Improper Denial of Coverage and Benefits

In Count 1, plaintiffs assert a claim for recovery of benefits due under 29 U.S.C. § 1132(a)(1)(B), arguing that GHC wrongly denied their requests for speech and occupational therapy  treatments for K.H.'s ASD  from 2017-2019.  Plaintiffs do not dispute that GHC denied their claims on the ground that neither treatment was an evidence-based, non-investigational treatment for ASD in children over 9 years old.[10]  They further agree that only evidence-based, non-investigational treatments for ASD were covered under the plan.  Finally, plaintiffs acknowledge that the plan gave GHC discretionary authority to determine coverage.

Accordingly, the only question before the court is whether GHC's decision to deny plaintiffs' claims for benefits was "arbitrary and capricious."  *See, e.g., Cerentano v. UMWA Health & Ret. Funds*, 735 F.3d 976, 981 (7th Cir. 2013) (when plan grants administrator discretionary authority to determine eligibility for benefits, court asks only whether administrator's decision was arbitrary and capricious).  Under the arbitrary and capricious standard, a reviewing court overturns the challenged decision only where there is an absence of reasoning to support it. *Jackman Fin. Corp. v. Humana Ins. Co.*, 641 F.3d 860, 864 (7th Cir. 2011) (citations omitted). The court also considers whether the plan administrator communicated "specific reasons" for its determination to the claimant, whether the plan administrator afforded the claimant "an

---

[10] Plaintiffs do not challenge GHC's alternative determination that the treatments were not covered under the benefit for outpatient rehabilitation, which was the basis for the 2018 denials of speech therapy.

opportunity for full and fair review," and "whether there is an absence of reasoning to support the plan administrator's determination." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009) (quoting *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832–33 (7th Cir. 2009) (internal quotation marks and citation omitted)).

Even where a claim administrator has equally plausible but conflicting facts as to whether a particular claim is entitled to coverage, it is not arbitrary and capricious for the claim administrator to conclude the claim is not covered. *See, e.g., Smith v. Office of Civilian Health and Medical Program of the Uniformed Services*, 97 F.3d 950, 956–57 (7th Cir. 1996). The decision will be overturned only if it is "downright unreasonable." *Tegtmeier v. Midwest Operating Engineers Pension Tr. Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004) (quoting *Carr v. Gates Health Care Plan*, 195 F.3d 292, 295 (7th Cir. 1999)). *See also Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1107–08 (7th Cir. 1998) ("Review under this standard is extremely deferential and has been described as the least demanding form of judicial review . . . It is not, however, without some teeth."). Further, when review under ERISA is deferential, courts are limited to the information submitted to the administrator. *See Perlman v. Swiss Bank Comprehensive Disability*, 195 F.3d 975, 982 (7th Cir. 1999) (citing cases).

Measured against this standard, GHC's claim denials were not arbitrary and capricious. GHC relied primarily on Policy 121, which linked the question whether a particular treatment for ASD was "evidence-based" to the comprehensive National Standards Project. It is undisputed that the NSP found a lack of research establishing that language training was an effective intervention for children older than 9. Likewise, it is undisputed that the NSP determined that sensory intervention (the type of occupational therapy plaintiffs were seeking)

18

was an as-yet unestablished intervention.  In addition to relying on the NSP, GHC twice asked for input from independent experts in child psychiatry, neither of whom found support in the medical literature for the use of speech or SI occupational therapy to treat older children with ASD.  These sources provide rational support for GHC's conclusions that the sought-after treatments were not covered under the plan because they were not "evidence based" treatments for ASD.

Plaintiffs advance a grab-bag of arguments to show that GHC's decisions were nevertheless arbitrary and capricious, but none is persuasive.  First, they say the NSP does not support GHC's conclusion with respect to speech therapy because "speech therapy" is not mentioned in the report.  But as GHC points out, the report considered the effectiveness of "Language Training (Production)," which it described as "mak[ing] use of various strategies to elicit verbal communication," which is something a speech therapist is likely to do.  If anything, GHC's interpretation of "language training" as used in the NSP report to broadly encompass "speech therapy" was more, not less, generous to plaintiffs.

Plaintiffs next argue that the "reams of information" they presented to GHC constituted "overwhelming" evidence "from a scientific point of view" showing that the speech therapy and occupational therapy treatments they sought for K.H. were evidence-based.  Dkt. 48, at 18. Plaintiffs do not discuss this evidence in any detail in their brief, but their proposed findings of fact address two reports: (1) "Evidence-Based Practices for Children, Youth, and Young Adults with Autism Spectrum Disorder" (Odom 2014)[11]; and (2) the National Standards Project. *See*

---

[11] Plaintiffs assert that this report was published by the association of the American Speech-Language pathologists, but the record does not support this assertion. *See* dkt. 53-10, at 1.

Plts.' PFOF, dkt. 49, at ¶¶ 56-57, 63-68.  But neither provides compelling–if any–support for plaintiffs' argument that the therapies they were seeking were evidence-based practices for the treatment of ASD.  With respect to the 2014 Odom report, plaintiffs point out that the report found "social skills training," "prompting" and "social narratives" to be evidence-based practices.  But plaintiffs simply presume that these interventions are the same as the speech therapy they were requesting for K.H., without offering any of evidence to support that presumption.  Further, the Odom report also concluded that other therapies that seem to involve speech, namely "aided language modeling" and "sentence-combining technique," *lacked* sufficient evidentiary support. *See* dkt. 53-10, at 25-26.  Plaintiffs' lay interpretation of the Odom report fails to show that GHC was "downright unreasonable" in deferring to the NSP.

Plaintiffs' arguments based on the NSP itself are even less persuasive.  They argue that because K.H.'s occupational therapy was aimed at and was helping her progress towards developmental "targets" that the NSP researchers deemed relevant, it was therefore an evidence-based treatment under the NSP.  Not only is this faulty logic, but the NSP specifically found that sensory intervention occupational therapy was an "unestablished" treatment for ASD.  This is consistent with one of the other reports submitted by plaintiffs, which recognized that the evidence relating to the effectiveness of SI occupational therapy was "inconclusive" and remained "weak and require[d] further study." *See* dkt. 37-10, GHC_602.[12]

---

[12] Plaintiffs also argue that GHC's decision was arbitrary and capricious because nothing in the record indicates "whether nonintensive-level therapy would be an evidence-based therapy where a child received intensive-level therapy before age 10." Dkt. 48, at 21. But plaintiffs do not cite to any medical studies or plan language to support their argument that the receipt of intensive-level treatment before age 10 has any bearing on whether speech therapy after that age had been shown to be an evidence-based treatment for ASD at the time of the claim denials at issue. Accordingly, this argument does not advance their claim that GHC's denials were unreasonable.

Contrary to plaintiffs' conclusory assertion, then, none of their evidence provided strong support for their argument that the speech therapy and occupational therapy treatments they sought for K.H. were evidence-based. Perhaps in recognition of this fact, plaintiffs switch gears and focus on procedure, arguing that GHC's decisions were arbitrary because there is nothing in the administrative record or its explanations of its claim denials indicating whether GHC ever reviewed any of their evidence or why GHC found it unpersuasive. Plaintiffs specifically argue that, while GHC claims to have sent their evidence for review to the independent MRIoA experts, there is no evidence that GHC actually did so or that the doctors actually read the materials.

I agree with plaintiffs that it is not clear from the record whether GHC forwarded plaintiffs' materials to the first MRIoA expert, Dr. Holmes, or if either doctor actually reviewed them. But even if they didn't, that does not show that GHC failed to fully and fairly review plaintiffs' claim. Dr. Holmes and Dr. Hartman were both specialists in adolescent psychiatry with experience in autism treatment. As such, GHC could reasonably expect them to be aware of the current state of the clinical research and the extent to which the treatments plaintiffs were requesting for K.H.'s ASD were generally accepted as effective by the medical community at large. And again, none of plaintiffs' evidence supports their claim that the medical community had deemed the evidence sufficient to find those treatments effective before the National Clearinghouse on Autism Evidence & Practice issued its report in 2020.

Moreover, even if GHC had relied on Policy 121 alone, which in turn relied on the NSP, this would not constitute a denial of a full and fair review. By choosing to link the determination of whether an ASD treatment was "evidence based" to the NSP, GHC plainly

intended "to avoid a case-by-case battle of the experts in which [it] would be required to re-evaluate covered treatments each time a self-proclaimed 'expert' publishes a new article." *Bechtold v. Physicians Health Plan of N. Indiana, Inc.*, 19 F.3d 322, 326 (7th Cir. 1994).  Plaintiffs do not contend that the NSP was an unreliable source or that it lacked general acceptance in the medical community as an authoritative, systematic review of the medical research concerning the effectiveness of various treatment interventions for ASD.  As other courts, including this one, have recognized, a health insurer does not act unreasonably in relying on a pre-published policy to determine whether a treatment is medically necessary or non-investigational, provided that the policy is developed from reliable sources.  *See, e.g., Quality Infusion Care Inc. v. Aetna Life Ins. Co.*, 257 Fed. Appx. 735, 736 (5th Cir. 2007) (recognizing that "an insurer's reliance on a pre-published plan to determine what is medically necessary can be reasonable under ERISA") (internal quotation marks omitted); *Univ. of Wisconsin v. Kraft Foods Glob., Inc.*, No. 14-CV-805-WMC, 2015 WL 7308681, at *8 (W.D. Wis. Nov. 18, 2015) (claimants not denied full and fair review even if insurer relied solely on a policy bulletin as basis for denying claim, where the policy itself listed the references insurer consulted in creating them, and "plaintiffs neither attack the reliability of those sources nor that the sources support the standards adopted."); *Neal v. Christopher & Banks Comprehensive Major Med. Plan*, 651 F. Supp. 2d 890, 909 (E.D. Wis. 2009) ("The fact that [the administrator] has relied upon a scientifically-based guideline of a professional medical specialty organization, namely the six-month rule adopted by many transplant programs and supported by the studies described in the two articles, provides a rational basis for its decision.").

22

The only potential criticism that can be lodged against GHC's reliance on the NSP is that it was out of date.  But again, plaintiffs have failed to show—much less argue—that the evidence they submitted reviewed the present state of the medical research or showed conclusively that there was no longer any controversy about the effectiveness of speech therapy or SI occupational therapy in treating ASD in children 10 or older.  Absent clear-cut evidence in this regard, it is simply not the province of this court to second-guess GHC's continued reliance on the NSP (corroborated by the independent MRIoA experts) until the National Clearinghouse on Autism Evidence & Practice issued its updated survey of the medical literature in 2020.  As the Seventh Circuit cautioned in a similar case:

> The pace of medical science is ever quickening; yesterday's esoteric experiment is today's miraculous cure . . . at issue here is the point where a treatment which has been experimental in the past crosses the line into general acceptance—the point at which the medical value  of a treatment is no longer generally disputed. Perhaps no such line exists; we are probably dealing more with a zone of perceived effectiveness than a precise dividing line. What is evident, though, and foremost in our minds as we consider this case, is the incompetence of courts to decide when exactly that line or zone has been traversed. Such decisions are judgment calls for medical scientists and health-care professionals, not judges.

*Smith*, 97 F.3d at 956–57.

Finally, in deciding whether GHC's decisions to deny benefits were arbitrary and capricious, I must consider any conflict of interest that exists when, as here, a plan has the dual role of deciding and paying benefits claims.  *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009); *Metro. Life Ins. v. Glenn*, 554 U.S. 105, 112 (2008).  Generally, a conflict of interest is weighed as a factor in a court's review of an ERISA benefits decision and can act as a tie breaker in a close case.  *Lacko v. United of Omaha Life Ins. Co.*, 926

F.3d 432, 440 (7th Cir. 2019).  Conflicts "carry less weight when the insurer took active steps to reduce potential bias and to promote accuracy."  *Raybourne v. Cigna Life Ins. Co. of New York*, 700 F.3d 1076, 1082 (7th Cir. 2012). Specifically, a court should consider "the reasonableness of the procedures by which the plan administrator decided the claim [and] any safeguards the plan administrator has erected to minimize the conflict of interest." *Majeski v. Metropolitan Life Ins. Co.*, 590 F.3d 478, 482 (7th Cir. 2009).

This case needs no tiebreaker. But the conflict of interest is not significant here. GHC took appropriate precautions to eliminate any conflict by including non-GHC practitioners on its appeals committee and by checking with independent experts familiar with ASD treatment to see if there was data in the medical literature demonstrating that the therapies sought by plaintiffs were effective treatments for ASD in children over age 10.  GHC also provided plaintiffs with the opportunity to appeal the denials and to attend the appeals committee's meeting.  Plaintiffs have not otherwise pointed to any circumstance indicating that GHC's conflict of interest tainted its decision.

In sum, plaintiffs fail to show that GHC abused its discretion or acted downright unreasonably in determining that the line between experimental and generally accepted had not yet been crossed at the time of the challenged denials in this case.  Accordingly, GHC is entitled to summary judgment on plaintiffs' claim under 29 U.S.C. § 1132(a)(1)(B).

## II.  Count III:  Federal Parity Act Claim

The Parity Act, codified at 29 U.S.C. § 1185a, "prohibits the imposition of more stringent treatment limitations for mental health treatment than for medical treatment." *Bushell*

*v. UnitedHealth Grp. Inc.*, No. 17-CV-2021 (JPO), 2018 WL 1578167, at *4 (S.D.N.Y. Mar. 27, 2018).  As noted in previous orders, the Parity Act is enforceable through a cause of action under 29 U.S.C. § 1132(a)(3).  *See Christine S. v. Blue Cross Blue Shield of New Mexico*, 428 F. Supp. 3d 1209, 1219-20 (D. Utah 2019) (plaintiffs could enforce their Parity Act rights only through § 502(a)(3) of ERISA, not § 502(a)(1)(B)).  To succeed on this claim, plaintiffs can either show that (1) the terms of the plan, as written, discriminate against mental health and substance abuse treatments in comparison to medical or surgical treatment, or (2) GHC applied a relevant treatment limitation to mental health and substance use disorder benefits more stringently than to a covered medical/surgical analog.  *Michael M. v. Nexsen Pruet Group Med. & Dental Plan*, No. 3:18-cv-0873, 2021 WL 1026383, at *10 (D.S.C. Mar. 21, 2021).

Plaintiffs' amended complaint purports to assert both facial and as-applied violations of the Parity Act. Dkt. 26, at ¶¶ 93-112.  In their briefs, however, plaintiffs fail to point to any express treatment limitation or other plan language that discriminates on its terms against mental health benefits.  Instead, they argue that GHC applied its limitation requiring that treatments be "evidence-based" or "non-experimental" more stringently to speech and occupational therapy for ASD, a mental impairment, than it does for pediatric chiropractic care, which is a treatment for physical impairments.  This is an as-applied challenge.

Under the Parity Act's implementing regulations, "any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health . . . benefits in the classification" must be "comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other facts used in applying the limitation with respect to medical/surgical benefits in the same classification."  29 C.F.R. § 2590.712(c)(4)(I).

GHC does not dispute that outpatient chiropractic treatment is in the same classification as outpatient speech or occupational therapy for treatment of ASD, nor does GHC dispute that it is a comparable medical/surgical analog for Parity Act purposes. But GHC contends that plaintiffs' Parity Act claim must be denied because GHC used a process for determining which chiropractic services were evidence-based that is comparable to the process it used in determining which ASD services were evidence-based. In both instances, says GHC, it reviewed the medical research and then prepared summary guidance that discussed which treatments were supported by research and which were not. In support, it relies on Policy 117 and the sources cited therein.

In response, plaintiffs do not dispute that GHC's sources support the conclusion, reflected in Policy 117, that chiropractic care is generally accepted as an evidence-based treatment for neuromusculoskeletal disorders. But they point out that none of these sources cite to any studies or medical research supporting the effectiveness of chiropractic treatment on children. In fact, one of the sources, a policy from Cigna, states that "most studies involving the long-term safety and effectiveness of spinal manipulation have been done on adult populations" and therefore "no generalizations can be made regarding the long-term safety and effectiveness of spinal manipulation for other populations."[13] Plaintiffs also cite a 2010 journal article finding "no first level evidence available in relation to the effectiveness of manual therapy for spinal disorders in the young population,"[14] and an earlier article, from 2002, which found that "[n]o studies have been published on chiropractic treatment of back pain in a paediatric population."[15]

---

[13] https://static.cigna.com/assets/chcp/pdf/coveragePolicies/medical/CPG278_chiropractic_care.pdf

[14] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2891802/

[15] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2794701/

In plaintiffs' view, this shows disparate treatment: whereas GHC demanded evidentiary proof of the effectiveness of the treatments plaintiffs were seeking for K.H.'s ASD, it has not demanded the same showing of the effectiveness of spinal manipulation treatments on children, which GHC undeniably covers if certain criteria are met.

In reply, GHC does not point to any reviews of the medical evidence or other literature specifically finding that spinal manipulation *is* effective in treating neuromusculoskeletal conditions in children, nor does it dispute plaintiffs' assertion that the topic is under-studied. But as GHC persuasively argues, this does not show that the process it used for determining whether speech or occupational therapy was an evidence-based treatment for ASD in children over 10 was more stringent than what it used for pediatric chiropractic care.  Notably, both Policy 117 and 121 show that in determining whether a particular treatment was investigational, GHC did not take it upon itself to examine case studies, randomized controlled trials, or other first-level evidence of that nature. Rather, for both ASD treatments and chiropractic care, GHC relied for its determination on outside sources, which in turn summarized and consolidated the status of research into medical treatments and the status of the acceptance of those treatments by the medical community at large.  As GHC explains:

> When the research distinguishes between the evidence supporting a treatment for different ages, then GHC's coverage guidance will distinguish between age groups.  When the research does *not* distinguish between ages– for example, when it finds no support for sensory integration therapy for *any* age or does find support for musculoskeletal chiropractic care generally – then GHC's coverage guidance will not differ depending upon the age of the patient.
>
> Reply Br., dkt. 65, at 11.

27

As GHC points out, all of the sources cited by plaintiffs on which GHC relied to create Policy 117 provide that chiropractic care is medically necessary for the treatment of musculoskeletal conditions if certain criteria are met.  In contrast to the NSP and its review of the status of treatments for ASD, none of the sources distinguishes between the effectiveness of that treatment based on the patient's age, as the NSP did with respect to speech therapy, and none of them states that the treatment is "experimental or investigational" in children, as the NSP did with respect to sensory integration occupational therapy.

In other words, to the extent there was a disparity in coverage for the ASD treatments sought for K.H. and pediatric chiropractic treatment, it arose not from GHC applying a more restrictive strategy or process to mental health benefits, but from a difference in the status of the acceptance of those treatments by the medical community at large.  Accordingly, GHC did not violate the Parity Act.

### III.  Count IV: GHC violated Wis. Stat. § 632.895(12m)

Finally, GHC is entitled to summary judgment on plaintiffs' claim that its claim denials violated Wisconsin's autism mandate, Wis. Stat. § 632.895(12m). Broadly speaking, the statute specifies that Wisconsin health insurers must cover certain "evidence-based" intensive-level and nonintensive-level services for ASD.  *Id*.  As plaintiffs concede, this claim rests on the same foundation as its ERISA claim, namely, that GHC acted arbitrarily and capriciously in finding that the treatments for which plaintiffs requested coverage were not "evidence-based."  Dkt. 48, at 31. Therefore, this claim fails for the same reasons that plaintiffs' ERISA claim fails.

ORDER

Defendant's motion for summary judgment, dkt. 34, is GRANTED.  The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 8th day of May, 2023.

BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge

29